ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
CHRISTINE CHUANG
IRINA TRASOVAN
Supervising Deputy Attorneys General
JESSE BASBAUM (SBN 273333)
BEN CONWAY (SBN 246410)
ELIA HERRERA (SBN 293278)
EMILIA P. E. MORRIS (SBN 253681)
Deputy Attorneys General
  1515 Clay Street, Suite 2000
  Oakland, CA 94612
  Telephone: (510) 879-0280
  E-mail: Jesse.Basbaum@doj.ca.gov
*Attorneys for Plaintiff State of California*

[*Additional Counsel Listed on Signature Page*]

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF RHODE ISLAND; AND STATE OF WISCONSIN,**<br><br>                                 **Plaintiffs,**<br><br>             **v.**<br><br>**UNITED STATES DEPARTMENT OF EDUCATION; AND LINDA MCMAHON, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF EDUCATION,**<br><br>                                 **Defendants.** | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Administrative Procedure Act Case<br><br>Date:<br>Time:<br>Dept:<br>Judge:<br>Trial Date:<br>Action Filed: |

**INTRODUCTION**

1. The State Personnel Development Grant program (SPDG) funds critical initiatives that support children with disabilities. Congress established the SPDG in 2004 through the Individuals with Disabilities Education Act (IDEA) to improve long-term outcomes for this vulnerable population. *See* 20 U.S.C. § 1451.

2. For decades, the U.S. Department of Education (Department) administered the SPDG in a routine and predictable manner. Each year, the Department would publish a notice inviting SPDG applications, and each notice would identify relevant priorities, each of which had been subject to notice and comment or were authorized by statute. States would then submit applications based on those priorities, and the Department would award multi-year grants to the most competitive applicants.

3. After an initial award, the Department would determine whether the grant should continue for the following year. These continuation determinations are governed by 34 C.F.R. § 75.253, which requires the Department to grant continuations so long as the grantee meets enumerated performance and financial metrics. The Department has confirmed that discontinuations are rare, stating recently, "In general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance . . . ." Education Department General Administrative Regulations and Related Regulatory Provisions, 89 Fed. Reg. 70300, 70316 (Aug. 29, 2024) (to be codified at 34 C.F.R. pts. 75, 76, 77, 79, 299).

4. But in 2025, the Department abruptly departed from this settled practice, unlawfully discontinuing the SPDG grants in Plaintiff States.[1] for political reasons. It did so notwithstanding that the States' programs had, for years, fulfilled the published SPDG priorities. For example, consistent with published SPDG priorities, Plaintiff State of California's program implemented critical reforms to California's personnel development in early intervention, early education, and transition services to ensure children with disabilities receive the support they need to thrive in

---

[1] "Plaintiff States" includes the States of California, Rhode Island, and Wisconsin. Pursuant to Civil Local Rule 5-1(i)(3), the States of Rhode Island and Wisconsin concur in the filing of this document.

Complaint for Declaratory and Injunctive Relief

both the short and long term. Each of Plaintiff States' programs also qualified for a continuation award under the criteria set out in 34 C.F.R. § 75.253(a).

5. Nevertheless, in September 2025, the Department discontinued each grant in a series of boilerplate notices that vaguely claimed that the programs "reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration" and thus were "not in the best interest of the Federal Government."

6. The notices also made clear that the "priorities and policy preferences" of the current Administration include a reflexive hostility to any reference, no matter how fleeting, to diversity, equity, or inclusion (DEI). The notices thus cited stray sentences from Plaintiff States' original applications—submitted in 2021, 2022, and 2024—to justify the otherwise generic discontinuations, even though the Department previously *required* Plaintiff States to implement equity programs as part of their SPDG applications.

7. These discontinuations were unlawful in several respects. First, Defendants relied on unpublished priorities that had not been subject to the notice-and-comment procedures required by the General Education Provisions Act (GEPA), the Department's own regulations, and the Administrative Procedure Act (APA). *See* 20 U.S.C. §§ 1221e-4, 1232(a); 5 U.S.C. § 706(2)(D). Second, Defendants misapplied the continuation regulation, 34 C.F.R. § 75.253(a)(5), by construing the "best interest" provision to grant nearly limitless discretion to discontinue grants based on new priorities. Third, Defendants violated the APA by changing their position and misleading Plaintiff States by requiring their applications to highlight equity initiatives and then penalizing them for the very same initiatives, and by failing to consider extensive reliance interests. Fourth, Defendants failed to provide the kind of "reasoned explanation" required by the APA and instead relied on conclusory and boilerplate language. For these and related reasons, Defendants' conduct violated the APA because it was contrary to law, without observance of procedure required by law, and arbitrary and capricious. The conduct also violated the Spending Clause of the United States Constitution and was *ultra vires*.

8. Defendants' misuse of the continuation procedures is not limited to the SPDG program. Defendants have discontinued numerous other critical grants in the same unlawful manner, and

Complaint for Declaratory and Injunctive Relief

courts throughout the country have vacated those discontinuations. *See Washington v. U.S. Dep't of Educ.*, 813 F.Supp.3d 1222, 1245–46 (W.D. Wa. 2025) (vacating discontinuation decisions and declaring the Department's actions "unlawful"); *Washington v. U.S. Dep't of Educ.*, 167 F.4th 1241, 1247 (9th Cir. 2026) (denying Department's motion to stay district court's order vacating discontinuation decisions); *Council for Opportunity in Educ. v. U.S. Dep't of Educ.*, No. 1:25-CV-03491-TSC, 2026 WL 120984, at *9–17 (D.D.C. Jan. 16, 2026) (granting preliminary injunction and staying discontinuations); *Bd. of Educ. of City Sch. Dist. of City of New York v. U.S. Dep't of Educ*, No. 25-CV-08547, at *8 (S.D.N.Y. Apr. 8, 2026) (vacating discontinuation decisions and declaring the Department's actions "without observance of procedure required by law").

9. To address and remedy Defendants' unlawful conduct, Plaintiff States respectfully request that the Court vacate the Non-Continuation Decisions, issue a declaration that the Department's use of 34 C.F.R. § 75.253(a)(5) in this manner is unlawful, and issue an injunction ordering the Department to make new, legally compliant continuation decisions.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

11. Venue is proper in this district under 28 U.S.C. § 1391(e)(1). Defendants are U.S. agencies or officers sued in their official capacities. Plaintiff State of California is a resident of this judicial district, and no real property is involved in this action.

12. Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)─(d) because this case is district-wide and because Plaintiff State of California maintains offices in the City and County of San Francisco.

## PARTIES

### I.    PLAINTIFF STATES

13. The State of California is a sovereign state of the United States of America and is represented by Rob Bonta, the Attorney General of California. The Attorney General is the

Complaint for Declaratory and Injunctive Relief

State's chief law officer and is authorized by the California Constitution, article V, section 13, to pursue this action on the State's behalf.

14. The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

15. The State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

## II.    DEFENDANTS

16. Defendant United States Department of Education is a cabinet agency within the executive branch of the United States government that has been created by Congress. 20 U.S.C. § 3411.

17. Defendant Linda McMahon is the Secretary of the United States Department of Education (Secretary) and is that agency's highest-ranking official. She is charged with the supervision and management of all decisions and actions of the agency. She is sued in her official capacity. 20 U.S.C. §§ 3411, 3412.

## FACTUAL ALLEGATIONS

### I.    THE DEPARTMENT'S FUNDING FOR SPECIAL EDUCATION PERSONNEL

#### A.    IDEA and the SPDG Program

18. Since 1975, through IDEA and its predecessor, the Education for all Handicapped Children Act, Congress has sought to ensure that children with disabilities have access to a free appropriate public education. *See* 20 U.S.C. § 1400(c)(3).

19. IDEA recognizes that "the education of children with disabilities can be made more effective by . . . supporting high-quality, intensive preservice preparation and professional development for all personnel who work with children with disabilities." *Id.*

20. One of IDEA's primary objectives is to assist states in educating and supporting children with disabilities. *See* 20 U.S.C. § 1400(d).

21. In passing IDEA, Congress recognized that "[s]tates, local educational agencies, and

4

educational service agencies are primarily responsible for providing an education for all children with disabilities." 20 U.S.C. § 1400(c)(6). Congress also recognized, however, that "it is in the national interest that the Federal Government have a supporting role in assisting State and local efforts to educate children with disabilities in order to improve results for such children and to ensure equal protection of the law." 20 U.S.C. § 1400(c)(6).

22. IDEA authorizes the SPDG program, which awards competitive multi-year grants to assist State educational agencies "in reforming and improving their systems for personnel preparation and professional development in early intervention, educational, and transition services in order to improve results for children with disabilities." 20 U.S.C. § 1451(a), (c).

23. Under IDEA, the Secretary "shall award" SPDG grants for each fiscal year. *See* 20 U.S.C. § 1451(c), (d).

24. The program is managed by the United States Department of Education, through the Office of Special Education and Rehabilitative Services.

**B.    The Department's Process for Awarding New Competitive Grants**

25. The Department's administration of SPDG is governed by IDEA, GEPA, and the Department's financial assistance regulations. GEPA requires that rules affecting the Department's financial assistance go through the APA's notice-and-comment process. *See* 20 U.S.C. §§ 1221e-4, 1232; *see also* 5 U.S.C. § 553.

26. The Department's financial assistance regulations fulfill these statutory requirements by publicly setting the rules for: (1) the competitive selection process for new grants; and (2) the process for determining whether to continue a grantee's multi-year project—a process that does not involve competition with other grantees. 34 C.F.R. § 75.200 (outlines selection process for new grants); *id.* § 75.253 (governs determination of grant continuations).

27. When the Department announces a competition for new grants for a particular fiscal year, it publishes an application notice in the Federal Register that explains, among other things:

- How to apply for a new grant;
- Whether the Secretary plans to approve multi-year projects and, if so, the project period that will be approved;

5

- The "absolute priorities" established for the selection of new grants for the program that year, as well as any "competitive preference priorities" for which an application could receive bonus points;

- The selection criteria and factors used to decide which applications will be awarded new grants and how the criteria will be weighed; and

- Any program performance measurements.

*See* 34 C.F.R. §§ 75.100, 75.101, 75.105, 75.110, 75.201.

28.  The Secretary must identify the specific priorities relevant to the application for each competitive federal grant program, including SPDG. 34 C.F.R. § 75.105(b)(1). Although the APA generally exempts grants from the rulemaking process, *see* 5 U.S.C. § 553, GEPA removes that exemption from the Department, with exceptions that do not apply to the SPDG grants in question. *See* 20 U.S.C. § 1232(d). Thus, to establish specific priorities, the Department must first publish the priorities in a notice in the Federal Register. *See* 34 C.F.R. § 75.105.

29. To be considered for an SPDG grant, States must partner with local education agencies, state agencies, and other persons and organizations that work in the special education field. 20 U.S.C. § 1452(b).

30. To make award determinations, the Department scores the quality of each application using the selection criteria and competitive priorities, then ranks the applications and awards new grants. 34 C.F.R. § 75.217; U.S. Department of Education, *Discretionary Grantmaking at ED* (*Discretionary Grantmaking*), 26–27 (2024), https://tinyurl.com/3kvfx8cn (describing the use of priorities in grant competitions). The selection criteria are given point values up to the total possible score that the Department announced for that year's grant competition. *See* 34 C.F.R. § 75.201; *Discretionary Grantmaking* at 26–27. Additional points may be earned if applicants meet competitive preference priorities. 34 C.F.R. § 75.105(c); *Discretionary Grantmaking* at 27.

31. After a grant is awarded, the Department holds a post-award conference with the awardee to discuss the program goals and establish processes for reporting and monitoring to "ensure that the grant is administered in compliance with applicable statutes and regulations and that the project's goals are achieved." *Discretionary Grantmaking* at 30.

Complaint for Declaratory and Injunctive Relief

32. IDEA requires SPDG grantees to submit annual performance reports to the Secretary that describe their progress and identify changes in strategies to improve their performance. 20 U.S.C. § 1453(d).

**C.    The Department's Process for Awarding Continuing Grants**

33. The Department's process for determining whether to continue multi-year grants is not competitive and it differs in several respects from the process for awarding new grants. *See Discretionary Grantmaking* at 31–32, 45; 34 C.F.R. § 75.253.

34. First, when awarding multi-year projects, the Department funds the initial budget period (usually 12 months) and "indicates [its] intention to make continuation awards to fund the remainder of the project period." 34 C.F.R. § 75.251.

35. Second, to be continued, multi-year projects do not go through an application process in which priority weights are assigned to competing applicants. *See* 34 C.F.R. §§ 75.118; Direct Grant Programs, 59 Fed. Reg. 30258, 30258 (June 10, 1994) (to be codified at 34 C.F.R. pt. 75) (eliminating application requirement for continuation awards); *Compare Discretionary Grantmaking* at 26–27 (funding decisions for discretionary grants are based on review of applications), *with id.* at 31–32, 45 (funding decisions for continuation awards are based on performance and financial data). Rather than reviewing an application, the Department may consider only information relevant to a grantee's performance for that year, including performance reports, performance measures, and financial data. *See* 34 C.F.R. §§ 75.118, 75.253(b); *Discretionary Grantmaking* at 32 ("The program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions."); Direct Grant Programs, 59 Fed. Reg. at 30259 ("[T]he continuation award decision—including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application."). Nothing in the applicable regulations authorizes the Department to deny a continuation award based on new, unpublished priorities.

36. Third, instead of competing for funds, the Department assigns priority to continuation awards over new grants. 34 C.F.R. § 75.253(c); *Discretionary Grantmaking* at 45 ("A grantee does not have to compete with other applicants to receive [a continuation award]."); Educational Division General Administrative Regulations (EDGAR), 45 Fed. Reg. 22494, 22559 (Apr. 3, 1980) (to be codified at 45 C.F.R. chs. I, XIV, XV) (explaining that each "continuation award will be judged on the basis of the criteria in [34 C.F.R. § 75.253(a)] and will not be subject to competition with other applications").

37. Consistent with this process, the Department has long represented that a cut-off in continuation award funding is "extremely rare in practice." Direct Grant Programs, 59 Fed. Reg. at 30259. More recently, the Department explained: "In general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance and often cite no concerns if they do not receive a continuation award." Education Department General Administrative Regulations and Related Regulatory Provisions, 89 Fed. Reg. at 70316.

II.    **PLAINTIFF STATES' SPDG APPLICATIONS AND AWARDS**

38. Plaintiff States applied for and were awarded SPDG grants in 2021 (Rhode Island), 2022 (California), and 2024 (Wisconsin).

A.    **The Notices Inviting Application**

39. For each round of SPDG funding, the Department published a notice inviting applications (NIA) in the Federal Register outlining the selection criteria for that year's application.[2] In connection with the NIA, the Department also circulated a grant application package (NIA Package).[3]

---

[2] Application for New Awards; State Personnel Development Grants, 85 Fed. Reg. 85616 (Dec. 29, 2020); Applications for New Awards; State Personnel Development, 87 Fed. Reg. 35525 (June 10, 2022); Applications for New Awards; State Personnel Development Grants, 89 Fed. Reg. 56356 (July 9, 2024).

[3] A grant application package designates at least one point of contact and "typically include[s] the Notice Inviting Application (NIA) published in the Federal Register," as well as "information about the process and content that will be used to evaluate [the] application," "the purpose and goals of the program," and a standard application form. *Discretionary Grantmaking* at 12–13.

Complaint for Declaratory and Injunctive Relief

40. Each NIA Package identified at least two absolute priorities that applicants were required to address. Specifically, the NIA Packages required applicants to explain how the proposed plans (1) relied on effective and efficient delivery of professional development; and (2) met statutory requirements related to state personnel development plans, such as ensuring that "economically disadvantaged and minority children are not taught at higher rates by [unqualified] teachers" and "provi[ding] training in how to teach and address the needs of children with different learning styles and children who are English learners." 85 Fed. Reg. at 85616–20; 87 Fed. Reg. at 35525–28; 89 Fed. Reg. at 56357–60.

41. The NIA Packages also included either a third absolute priority and/or one or more competitive preference priorities.[4]

42. The NIA Packages set forth the authority for their specific priorities and competitive preference priorities, all of which were codified by statute or federal regulation promulgated pursuant to notice-and-comment. 85 Fed. Reg. at 85616–20; 87 Fed. Reg. at 35525; 89 Fed. Reg. at 56357.

43. The NIA Packages also identified five "selection criteria" from EDGAR: (a) significance of the proposed project; (b) quality of the project services; (c) quality of the project personnel; (d) adequacy of resources and management plan; and (e) quality of the project evaluation. 85 Fed. Reg. at 85622–23; 87 Fed. Reg. at 35531–32; 89 Fed. Reg. 56365–66; *see also* 34 C.F.R. § 75.210.

44. In discussing criterion (c), regarding personnel, the NIA Packages explained: "In determining the quality of project personnel, the Secretary considers the extent to which the applicant encourages applications for employment from persons who are members of groups that have traditionally been underrepresented based on race, color, national origin, gender, age, or

---

[4] The 2021 NIA Package included a third absolute priority (to ensure individualized professional development activities to improve results for children with disabilities). *See* 85 Fed. Reg. at 85619–20. The 2022 NIA Package did not include a third absolute priority but did include one competitive preference priority. *See* 87 Fed. Reg. at 35529. The 2024 NIA Package included a third absolute priority (that the proposed plans "improv[ed] engagement between [s]chools and [f]amilies") as well as several competitive preference priorities. *See* 89 Fed. Reg. at 56359–62.

9

Complaint for Declaratory and Injunctive Relief

disability." 85 Fed. Reg. at 85623; 87 Fed. Reg. at 35531; 89 Fed. Reg. at 56365. This language tracked the EDGAR requirements of 34 C.F.R. § 75.210(e)(2).

45. In discussing criterion (d), regarding the adequacy of resources and management plan, the NIA Packages indicated that the Secretary would consider: "How the applicant will ensure that a diversity of perspectives are brought to bear in the operation of the proposed project, including those of parents, teachers, the business community, a variety of disciplinary and professional fields, recipients or beneficiaries of services, or others, as appropriate." 85 Fed. Reg. at 85623; 87 Fed. Reg. at 35532; 89 Fed. Reg. at 56365. This language tracked the EDGAR requirements of 34 C.F.R. § 75.210(g)(2)(v).

46. The NIA Packages also explained that all applicants were required to address Section 427 of GEPA, commonly referred to as the "GEPA Equity Directive." The Equity Directive requires all applicants for Department funding to include in applications "a description of the steps the applicant proposes to take to ensure equitable access to, and participation in, its federally-assisted program for students, teachers, and other program beneficiaries with special needs." *Id.*; 20 U.S.C. § 1228a. The Equity Directive requires—and the NIA Packages stressed— that an applicant must explain how it will "overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age." 20 U.S.C. § 1228a(b).

## B.    Plaintiff States' Applications

### 1.    State of Rhode Island

47. On March 9, 2021, Rhode Island—through the Rhode Island Department of Elementary and Secondary Education (RIDE)—submitted an application with a 111-page narrative ("Rhode Island Narrative") in response to the 2021 NIA Package.

48. Rhode Island's application addressed two absolute priorities of the 2021 NIA Package.

49. According to the Rhode Island Narrative, RIDE's proposed plan sought to retain a quality special education workforce by equipping Rhode Island educators with knowledge, skills, and support to effectively implement evidence-based literacy instruction and multi-tiered systems of support that would improve literacy outcomes for children with or at-risk for disabilities.

50. To address the GEPA Equity Directive, as required by law and by the 2021 NIA Package, RIDE's application included a separate GEPA Statement explaining how RIDE would seek to overcome barriers to equitable participation. Accordingly, RIDE's GEPA Statement discussed partnerships with external groups as well as RIDE's internal Educators of Color Committee.

51. The Rhode Island Narrative discussed the same equity-related initiatives to address the 2021 NIA Package's selection criteria related to "quality of project personnel," (criterion (c)). Criterion (c) was based on the requirements of 34 C.F.R. § 75.210(e)(2).

**2. State of California**

52. On July 22, 2022, California—through the California Department of Education (CDE)—submitted an application with a 70-page narrative ("California Narrative") in response to the 2022 NIA Package.

53. California addressed the absolute priorities and the competitive preference priority of the 2022 NIA Package.

54. California sought funding to reform California systems for personnel development in early intervention, early education, and transition services to improve results for young children with disabilities or at risk for developmental delays.

55. CDE's state plan was designed to serve: (1) children with disabilities and children at risk for developmental delays, particularly in early intervention programs, preschool, and transitional kindergarten; (2) families navigating early intervention and preschool transitions; and (3) educators, education coaches, early childhood providers, administrators, and interagency partners.

56. The California Narrative explained that the program would be administered by the Napa County Office of Education (NCOE), which would support the implementation of professional development, job-embedded coaching, and programs and activities designed to enhance the quality of personnel serving children with disabilities.

57. To address the 2022 NIA Package's selection criteria related to "quality of project personnel," (criterion (c)) the California Narrative discussed NCOE's Diversity, Equity, and

Inclusion (DEI) Committee. Criterion (c) was based on the requirements of 34 C.F.R. § 75.210(e)(2).

### 3. State of Wisconsin

58. On August 23, 2024, Wisconsin—through the Wisconsin Department of Public Instruction (DPI)—submitted an application with a 75-page narrative ("Wisconsin Narrative") in response to the 2024 NIA Package.

59. Wisconsin addressed all absolute priorities and two competitive preference priorities of the 2024 NIA Package.

60. Wisconsin sought funding for Educators Forward, a partnership among DPI; Wisconsin's Department of Health Services and Department of Workforce Development; Wisconsin's Family Assistance Center for Education, Training, and Support; two state university special educator preparation programs; the Wisconsin Council of Administrators of Special Services; Wisconsin's 12 regional education service agencies; and small and mid-sized school districts throughout the state.

61. Educators Forward aims to improve outcomes for students with disabilities by increasing the number of well-qualified, fully certified special educators and to expand the ability of administrators to serve as instructional leaders who create an equity-based, cooperative, and inclusive environment through a multilevel system of personnel development supports.

62. To address the 2024 NIA Package's selection criteria related to "adequacy of resources and management plan," (criterion (d)) the Wisconsin Narrative discussed a statewide coaching program that incorporated equity principles. Criterion (d) was based on the requirements of 34 C.F.R. § 75.210(g)(2)(V).

### C. The Department Awards Multiyear Grants and Continuation Awards

#### 1. State of Rhode Island

63. On January 28, 2021, the Department approved Rhode Island's application for funding. The award allocated differing funding amounts per year, granting $519,691 for FY 2021, $789,543 for FY 2022, $782,205 for FY 2023, $753,852 for FY 2024, and $617,774 for FY 2025.

64. The first grant award notification (GAN)[5] identified five budget periods, with the first spanning from July 1, 2021, to June 30, 2022, and the last spanning from July 1, 2025, to June 30, 2026.

65. Pursuant to 75 C.F.R. § 75.253, the Department provided one-year continuation awards for the next three budget periods, with no indication that the grant was in danger of being discontinued. Specifically, the Department issued a continuation award on September 29, 2021,[6] for the budget period spanning July 1, 2022, to June 30, 2023; August 28, 2023, for the budget period spanning July 1, 2023, to June 30, 2024; and August 15, 2024, for the budget period spanning July 1, 2024, to June 30, 2025.

66. On July 21, 2025, RIDE received a GAN granting no additional funds, and extending the fiscal year budget from July 1, 2024, to September 30, 2025. The GAN also listed a new budget period for the fifth year of the award spanning October 1, 2025, to June 30, 2026.

67. During the funded period, Rhode Island successfully met all program goals and performance requirements and timely submitted all required performance and financial reports. Rhode Island's implementation of the program focused on building the state's capacity to provide structured literacy for students who receive special education and related services. In doing so, the program provided coaching and technical assistance to a cadre of two dozen systems-level coaches from around the state to effectively implement multi-tiered systems of support to improve literacy instruction and also to run Science of Reading trainings for numerous cohorts of Rhode Island educators. The program also provided training to statewide reading specialists in strategies aligned with the science of reading and structured literacy to design high-impact literacy intervention in small groups.

68. Additionally, RIDE collaborated with faculty in the University of Rhode Island's Communication Disorders Department to develop five early childhood courses on language

---

[5] A GAN "sets the amount of the grant award and establishes other specific conditions, if any." 34 C.F.R. § 75.235. The Department typically released a GAN for each year between August and September.

[6] The Department issued RIDE a GAN on September 29, 2021, frontloading the grant continuation award for FY 2022. The frontloaded funds were not available for use until FY 2022, and as a result the Department issued another GAN on September 8, 2022, with a budget amount set at $1 for the performance period.

Complaint for Declaratory and Injunctive Relief

development and oral literacy and with the Tennessee Center for the Study and Treatment of Dyslexia to develop and publish two self-paced professional learning modules on dyslexia that are freely available to all educators in the state. RIDE also partnered with Rhode Island College to strengthen partnerships for teacher practicums in two of the state's largest school districts and established partnerships with the Rhode Island Parent Information Network (the federally funded Parent Training and Information Center) to develop an online Toolkit for families on the science of reading, with literacy webinars and a social media campaign, to increase awareness of tools for families to support literacy.

### 2.    State of California

69. On September 29, 2022, the Department approved California's application for funding. The award allocated $2.1 million per year for up to five years.

70. The first GAN identified five budget periods, with the first spanning from October 1, 2022 to September 30, 2023, and the last spanning from October 1, 2026 to September 30, 2027.

71. Pursuant to 75 C.F.R. § 75.253, the Department provided annual one-year continuation awards for the next two budget periods, with no indication that the grant was in danger of being discontinued. Specifically, the Department issued a continuation award on August 28, 2023, for the budget period spanning October 1, 2023 to September 30, 2024; and August 15, 2024, for the budget period spanning October 1, 2024 to September 30, 2025.

72. During the funded period, California successfully met all program goals and performance requirements and timely submitted all required performance and financial reports. Overall, the program implemented evidence-based practices across 18 classrooms, impacting approximately 7,000 students with disabilities. In doing so, NCOE collected data and developed data tracking systems, completed family interviews, and delivered professional learning to family resource centers, family empowerment centers, and Early Start/Regional Center staff. NCOE had also facilitated the Impact Inclusion Workgroup, whose members consist of state agencies, institutes of higher education, parents, education providers, and family resource centers. NCOE also established partnerships with other local agencies and early childhood providers to ensure

Complaint for Declaratory and Injunctive Relief

children with disabilities have access to high-quality early education and smooth transitions to preschool and kindergarten.

### 3. State of Wisconsin

73. On September 26, 2024, the Department approved Wisconsin's application for funding. The award allocated $2.1 million per year for up to five years.

74. The first GAN identified five budget periods, with the first spanning from October 1, 2024, to September 30, 2025, and the last spanning from October 1, 2028, to September 30, 2029.

75. During the funded period, Wisconsin successfully met all program goals and performance requirements and timely submitted all required performance and financial reports. More than 300 new special education teachers from 156 school districts and independent charter schools participated in the program, representing almost 20 percent of new special education teachers and more than one third of the school districts and charter schools in the state. Eighty-three percent of program participants indicated that they were likely to remain in their current positions, compared to an overall forty-nine percent attrition rate among new Wisconsin special education teachers in their first six years of practice.

## III. DISCONTINUATION OF PLAINTIFF STATES' MULTIYEAR GRANTS

### A. President Trump's Anti-DEI Executive Orders and the Department's Directives

76. Shortly after his inauguration in 2025, President Trump issued a series of executive orders broadly seeking to end initiatives related to "equity" and any federal funding for such initiatives.

77. Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing," directed various departments to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025). The Order also required each federal agency head to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts" within 60 days. *Id.*

15

Complaint for Declaratory and Injunctive Relief

78. Executive Order 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," required the Director of the Office of Management and Budget, with the assistance of the Attorney General, to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisitions, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." 90 Fed. Reg. 8633, 8634 (Jan. 31, 2025). The Order also instructed federal agencies to include terms in every contract or grant award requiring contractual counterparties or grant recipients "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.*

79. Executive Order 14190, "Ending Radical Indoctrination in K-12 Schooling," required the Secretary of Education, Secretary of Defense, and Secretary of Health and Human Services to develop plans for "eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology." 90 Fed. Reg. 8853, 8854 (Feb. 3, 2025).

80. In keeping with these Executive Orders, on February 5, 2025, then-Acting Secretary of Education Denise Carter issued an internal directive titled "Eliminating Discrimination and Fraud in Department Grant Awards" ("February Directive"). A true and correct copy of the February Directive is attached as Exhibit A.

81. The February Directive announced a new Departmental priority to "ensur[e] that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic." Ex. A.

82. The Secretary directed as follows:

Department personnel shall conduct an internal review of all new grant awards, grants that have not yet been awarded to specific individuals or entities (e.g., notices of funding opportunities), and issued grants. Such review shall be limited to ensuring that Department grants do not fund discriminatory practices—

Complaint for Declaratory and Injunctive Relief

including in the form of DEI—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication.

83. The February Directive instructed that grants "deemed inconsistent with these priorities shall, where permitted by applicable law, be terminated in compliance with all notice and procedural requirements in the relevant award, agreement, or other instrument."[7] Ex. A.

84. On June 5, 2025, Department Senior Advisor Murray Bessette, who at the time was delegated the duties and functions of the Assistant Secretary of the Office of Planning, Evaluation, and Policy Development, issued an additional internal directive titled "Non-Competing Continuation Discretionary Grant Award Review Policy" ("June Directive" and, together with the February Directive, "Department Directives"). A true and correct copy of the June Directive is attached as Exhibit B.

85. The June Directive announced a new priority directing program offices to review grants in connection with continuation decisions to "advance the Administration's priorities of ensuring Federal funds do not support projects that: violate the letter or purpose of Federal civil rights laws; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds." Ex. B.

86. Both Department Directives applied to all Department personnel, including the Office of Special Education and Rehabilitative Services, the sub-agency responsible for the SPDG program.

87. Unlike the SPDG program priorities disclosed in the NIA Package, neither the Department Directives nor the priorities set forth in the Executive Orders were issued through notice-and-comment rulemaking. *Cf.* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d).

---

[7] The February Directive cited 2 C.F.R. § 200.340(a)(4) as authority to terminate grants, and did not mention discontinuations or cite to 34 C.F.R. § 75.253. However, as explained below, the discontinuation notices in this matter tracked, verbatim, key portions of the Directive's language.

17

Complaint for Declaratory and Injunctive Relief

88. Neither the Department Directives nor the Executive Orders authorize—or even purport to authorize—the Department to alter the regulations governing continuation awards or the factors relevant to such awards.

89. At the time of their issuance, the Department did not circulate the Department Directives to federal grant recipients or otherwise publicize them.

90. Upon information and belief, the February Directive was first made public by the media, on or around February 5, 2025.[8]

91. Upon information and belief, the June Directive was first made public by the Department on or around June 1, 2026 in separate litigation—approximately one year after its issuance within the Department.[9]

**B.    Non-Continuation Decisions**

92. On September 5, 2025,[10] the Department sent Plaintiff States nearly identical Notices of Non-Continuation of Grant Award ("Non-Continuation Decisions") explaining that SPDG funding would be discontinued in its entirety at the end of the operative budget period (September 30, 2025) because continuing the project would not be "in the best interest of the Federal Government," citing 34 C.F.R. § 75.253(a)(5).

93. The Non-Continuation Decisions further stated:

> The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds. The grant is therefore inconsistent, and no longer effectuates, the best interest of the Federal Government and will not be continued.

---

[8] Prem Thakkar (@premthakker.bsky.social), Bluesky (Feb. 5, 2025, at 2:08 p.m.), https://tinyurl.com/k6vc642n.

[9] The June Directive was attached to a declaration filed in support of the Department in a different matter. *California v. U.S. Dep't of Educ.*, Bessette Decl. Ex. A, No. 25-CV-10548-AK (D. Mass. June 1, 2026), Doc. No. 155.

[10] Although the notices were emailed on September 5, 2025, they were dated August 27, 2025.

Complaint for Declaratory and Injunctive Relief

94. The Non-Continuation Decisions stated that the Department had identified in each state's application "information indicating that the applicant has proposed activities that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education."

95. Each Non-Continuation Decision then referenced equity-related language—amounting to two to three sentences—in each of Plaintiff State's underlying applications. The equity-related language in each application had been included to comply with the GEPA Equity Directive (Rhode Island); Selection Criteria (c) (California and Rhode Island); and Selection Criteria (d) (Wisconsin). The Non-Continuation Decisions concluded, "[a]s a result of the information identified . . . the program office has determined that continuation of the project would be in conflict with agency policy and priorities, and so is not in the best interest of the Federal Government."

96. Upon information and belief, the Department's "review of grants" was prompted, at least in part, by the February Directive and/or the June Directive.

97. The Non-Continuation Decisions tracked, verbatim, key language from the Department Directives.

98. On September 9, 2025 (as to Rhode Island and California) and December 16, 2025 (as to Wisconsin), the Department distributed identical GANs to each Plaintiff State reflecting the discontinuation. The GANs explained that "no additional funds are provided by this action," and "[p]er the Notice of Non-Continuation of Grant Award sent on September 5, 2025, this grant has been determined to be inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued." *See* 34 C.F.R. 75.253(a)(5), (f)(1).

99. In discussing these discontinuations with the press, a Department spokesperson stated that its "continuations and cancellations of IDEA part D grants are part of a broader Trump administration protocol for 'evaluating every federal grant to ensure they are in line with the administration's policy of prioritizing merit, fairness, and excellence in education.'" Mark Lieberman, *Most—But Not All—Imperiled Federal Grants for Special Education Will Continue*, EducationWeek (Sept. 5, 2025), https://www.edweek.org/teaching-learning/most-but-not-all-imperiled-federal-grants-for-special-education-will-continue/2025/09. The Department also

19

indicated that programs with grant materials that used phrases like "diversity, equity, and inclusion"; "cultural humility"; and "systemic racism" were among those canceled. The Department explained that the "non-continued grant funds are not being cut; they are being re-invested immediately into high-quality programs that better serve special needs students." *Id.*

### C.    Denials of Request for Reconsideration

100. The Non-Continuation Decisions stated that Plaintiff States could request reconsideration within seven calendar days. *See* 34 C.F.R.§ 75.253(g).

101. California's CDE submitted a request for reconsideration on September 12, 2025, which was summarily denied on September 23, 2025.

102. Rhode Island's RIDE submitted a request for reconsideration on September 12, 2025, which was summarily denied on September 23, 2025.

103. Wisconsin's DPI submitted a request for reconsideration on September 11, 2025, which was summarily denied on September 29, 2025.

104. The Department's denials did not address any of Plaintiff States' arguments or evidence, and instead simply restated the grounds for the original discontinuation, again tracking the language of the Department Directives.

## IV.   IMPACT OF NON-CONTINUATION DECISIONS

### A.    State of Rhode Island

105. Rhode Island's SPDG program terminated immediately upon notice that the program had been discontinued.

106. The RIDE SPDG program was designed to enhance the preparation and professional learning of educators to implement scientifically-based literacy instruction. In the final year of the grant, additional professional learning opportunities would have been offered along with educator coaching to support the implementation of these practices.

107. Specifically, in the fifth and final year of the grant, the program would have funded new training cohorts, evidence-based literacy instruction for early childhood educators, conscious discipline training, coaching for educators, continued collaboration with educator preparation programs to align with evidence-based literacy instruction, and family sessions to help families

Complaint for Declaratory and Injunctive Relief

integrate evidence-based literacy at home. The lost funding has reduced resources that would have provided educators with professional learning and development to improve special education outcomes and connect families to literacy support.

108. The discontinuation is negatively impacting Rhode Island's education system by reducing resources aimed at improving literacy outcomes for children with or at-risk for disabilities.

**B.  State of California**

109. After the discontinuation, neither California nor subgrantee NCOE had sufficient funds to sustain the SPDG program and, as a result, the program closed on December 31, 2025.

110. The discontinued program had been designed to improve outcomes for students with disabilities by building the capacity of educators, administrators, and systems. The lost funding has reduced resources that connect families with schools through family engagement initiatives that empowered parents to advocate for and support their children's education. Such impacts are more severe in under-resourced school districts, thus widening disparities in the quality of education provided to students with disabilities. Several staff will also be laid off as a result of the discontinuation.

111. The discontinuation will also strain California's education system in the long term because early interventions for special education students reduces the need for subsequent, more specialized and robust services. California serves approximately 883,862 students with disabilities ages three through twenty-two through special education programs. Cal. Dep't of Educ., *2025-26 Special Education Enrollment by Program Setting*, DataQuest, https://dq.cde.ca.gov/dataquest/DQCensus/SPEDEnr.aspx?agglevel=State&cds=00&year=2025-26 (last visited June 8, 2026). Programs like the SPDG are vital to ensuring timely appropriate services that build foundational skills for young children with disabilities.

**C.  State of Wisconsin**

112. After the discontinuation, neither Wisconsin nor its subgrantees had sufficient funds to sustain the SPDG program and, as a result, the program closed on September 30, 2025.

21

Complaint for Declaratory and Injunctive Relief

113. The discontinued program had been designed to improve outcomes for students with disabilities by building the capacity of educators, administrators, and systems. Specifically, the program was designed to address the critical retention crisis in Wisconsin, with only 43.2% of special education teachers remaining in the classroom by their eighth year (notably steeper than the overall statewide teacher retention rate, which sits at 52.6% over the same eight-year span). The lost funding has reduced resources that connected families with schools through family engagement initiatives that empowered parents to advocate for and support their children's education. In Wisconsin, the special education teacher retention crisis is felt acutely by rural communities.

114. The discontinuation will also strain Wisconsin's education system in the long term because upstream investments in special education teacher retention improve student outcomes and reduces special education costs.

V.    **VACATUR OF ANALOGOUS DISCONTINUATIONS IN *WASHINGTON V. DEPARTMENT OF EDUCATION***

115. Prior to the SPDG discontinuations, the Department discontinued a separate set of grants (which funded mental health services and supports) by relying on the same "best interest" provision in 34 C.F.R. § 75.253(a)(5). In response, a multistate coalition, including all Plaintiff States, filed an action challenging the non-continuation decisions on APA and constitutional grounds. *See Washington v. U.S. Dep't of Educ.*, 813 F. Supp. 3d 1222, 1228–29 (W.D. Wash. 2025) (order granting summary judgment).

116. In that matter, as here, Defendants "sen[t] boilerplate notices to Plaintiffs claiming that their grants conflicted with the Trump Administration's priorities and would not be continued." *Washington v. U.S. Dep't of Educ.*, 2025 WL 1836578, No. C25-1228-KKE, Compl. ¶ 6 (W.D. Wash. June 30, 2025).

117. On the merits, the District Court for the Western District of Washington found that the discontinuation notices and reconsideration denial letters, as well as the Department's change in continuation procedure via the February Directive, were "final and consequential agency actions" subject to judicial review. *Washington*, 813 F. Supp. 3d at 1237.

22

118. The District Court then held that the Department's new continuation procedure was arbitrary and capricious because it did not provide reasoned notice to the States or consider reliance interests, and because the decisions were unexplained and conclusory. *Id*. at 1237–39.

119. The District Court also ruled that the new procedure was contrary to law, holding that the Department is "not at liberty to use the continuation process to establish new grant priorities and apply them retroactively without the procedural protections Congress expressly applied to Department grant programs." *Id*. at 1244.

120. The District Court issued a declaration pursuant to 5 U.S.C. § 706(2) that the Department's actions were "unlawful and set aside" with respect to the grants at issue; permanently enjoined the Department from implementing the new discontinuation procedure; and vacated the discontinuation notices and letters denying reconsideration. *Id*. at 1245–46.

121. The Ninth Circuit denied two emergency stay motions. First, it ruled that the District Court properly exercised jurisdiction, thus rejecting the Department's arguments under the Tucker Act. *Washington v. U.S. Dep't of Educ.*, 161 F.4th 1136, 1138–40 (9th Cir. 2025). Second, it ruled that the Plaintiff States were likely to succeed on their arguments that the discontinuations were contrary to law and arbitrary and capricious. *Washington v. U.S. Dep't of Educ.*, 167 F.4th 1241, 1245 (9th Cir. 2026).

## VI.    2026 SPDG NOTICE INVITING APPLICATIONS

122. On April 15, 2026, the Department invited applications for a new round of SPDG grant funding available to states. *See* SPDG Assistance Listing Number: 84.323A, Fiscal Year (FY) 26 Grant Competition (Application Notice and Instructions). Applications are due on June 15, 2026.

123. Plaintiff States plan to apply to the Fiscal Year 2026 SPDG grant competition but have substantial uncertainty regarding their rights and obligations with respect to the application and, if approved, the subsequent continuation determinations.

124. Plaintiff States are concerned about the treatment of their future SPDG applications based on the Department's unlawful, arbitrary and capricious past discontinuations and its misapplication of IDEA and Department regulations, including 34 C.F.R. § 75.253(a)(5).

23

Complaint for Declaratory and Injunctive Relief

125. The Department will also be required to award SPDG grants in subsequent fiscal years. *See* 20 U.S.C. § 1451(c), (d).

126. Plaintiff States have historically applied for SPDG funding opportunities when eligible and when a competition is announced.

## CAUSES OF ACTION

## COUNT I

## ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(2)(A), (C)

### Contrary to Law

127. Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

128. The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the Defendants' Non-Continuation Decisions and Department Directives are agency actions subject to review under the APA.

129. The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

130. Defendants' Non-Continuation Decisions were contrary to law because, contrary to regulation and statute, they were made based on unpublished, new priorities that arose long after Plaintiff States first applied for SPDG awards.

131. Defendants may set program priorities for a grant program only at the outset of the program, when Defendants publish the application notice for new grants. Defendants cannot change the priorities for a grant after a multi-year grant has been awarded. *See, e.g.*, 34 C.F.R. § 75.100(a) ("Each fiscal year, the Secretary publishes application notices . . . *for new grants*[.]") (emphasis added); *id*. § 75.101(a)(4) (application notice includes "[a]ny priorities established by the Secretary for the program for that year"); *id*. § 75.105 (describing process for establishing "priorities for selection of applications in a particular fiscal year"). Continuation awards do not go through an application process. *See id*. § 75.118 (requirements for a continuation award).

Complaint for Declaratory and Injunctive Relief

132. The Non-Continuation Decisions were thus contrary to law because they conflict with 34 C.F.R. §§ 75.100(a), 75.101(a)(4), 75.105, and 75.118. *See Washington*, 813 F. Supp. at 1244 (discontinuations were contrary to law because Department is not permitted to run a "new grant contest evaluating existing original grant applications against new unpublished priorities"); *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 780 F. Supp. 3d 897, 921 (N.D. Cal. 2025) ("[A]gencies must follow a regulation if they promulgate one.").

133. The Non-Continuation Decisions were also contrary to law because they violated statutory notice-and-comment requirements. Under GEPA, "any generally applicable rule, regulation, guideline, interpretation, or other requirement that (1) is prescribed by the Secretary or the Department; and (2) has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program" requires notice-and-comment rulemaking, with limited exceptions not applicable here. 20 U.S.C. § 1232(a); *see also id*. §§ 1232(d), 1221e-4.

134. The new priorities referenced in the generic Non-Continuation Decisions, which followed the February Directive and/or the June Directive, triggered but did not comply with GEPA's notice-and-comment requirement. *See* 20 U.S.C. § 1232(a); *see also id*. §§ 1232(d), 1221e-4; *Washington*, 167 F.4th at 1245 ("These generic mass discontinuation decisions, guided by generally applicable policy criteria, seem to implicate GEPA's rulemaking requirement.").

135. The Non-Continuation Decisions were also contrary to law because Defendants misapplied the "best interest" provision in 34 C.F.R. § 75.253(a)(5). In making a "best interest" determination, the Department may consider *only* the kinds of materials listed in § 75.253(b)—*i.e.*, performance, fiscal, and management reports. *See* 34 C.F.R. § 75.253(b); *Washington*, 813 F. Supp. 3d at 1243. Instead, Defendants applied subsection (a)(5) in a way that "would permit an end-run around the statutory requirement of notice-and-comment rulemaking applicable to changing requirements for Department grant programs." *Id*. at 1244 (citing 20 U.S.C. §§ 1221e-4, 1232). This interpretation of subsection (a)(5) is "unreasonable, considering the regulatory text, history, and purpose, as well as the applicable statutory requirements governing Department grant programs" and consequently "contrary to law" for APA purposes. *Id*.

25

136. Finally, the Non-Continuation Decisions violated 34 C.F.R. § 75.253(c), which prioritizes continuation awards over new grants. *See id.* at 1245.

137. Defendants' Non-Continuation Decisions, and the Department Directives as applied to the SPDG program, have caused and are causing substantial injury, including irreparable harm.

138. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to an order and judgment, and to a permanent injunction, holding unlawful and vacating the Non-Continuation Decisions and the Department Directives as applied to the SPDG program, and enjoining Defendants from implementing, maintaining, or reinstating the Non-Continuation Decisions and the Department Directives as applied to the SPDG program.

## COUNT II

### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(2)(D)

#### Notice and Comment

139. Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

140. The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the Defendants' Non-Continuation Decisions and Department Directives are agency actions subject to review under the APA.

141. The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

142. "The APA requires agencies to advise the public through a notice in the Federal Register of the terms or substance of a proposed substantive rule, allowing the public a period to comment." *Erringer v. Thompson*, 371 F.3d 625, 629 (9th Cir. 2004) (citing 5 U.S.C. § 553). Under GEPA, Defendants are required to follow the APA's notice-and-comment rulemaking procedure when changing the requirements for grant competitions. *See* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d).

143. The new priorities referenced in the generic Non-Continuation Decisions, which followed the February Directive and/or the June Directive, triggered but did not comply with

26

GEPA's notice-and-comment requirement. 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d); *Washington*, 167 F.4th at 1245 ("These generic mass discontinuation decisions, guided by generally applicable policy criteria, seem to implicate GEPA's rulemaking requirement.").[11]

144. Without having proceeded through notice-and-comment procedures, the Non-Continuation Decisions and Defendants' actions in implementing them are procedurally invalid under the APA.

145. Defendants' Non-Continuation Decisions, and the Department Directives as applied to the SPDG program, have caused and are causing substantial injury to Plaintiff States, including irreparable harm.

146. Pursuant to 5 U.S.C. § 706, and 28 U.S.C. § 2201, Plaintiff States are entitled to an order and judgment, and to a permanent injunction, holding unlawful and vacating the Non-Continuation Decisions and the Department Directives as applied to the SPDG program, and enjoining Defendants from maintaining or reinstating the Non-Continuation Decisions and the Department Directives as applied to the SPDG program.

### COUNT III

### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(2)(A)

### Arbitrary and Capricious

147. Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

148. The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the Defendants' Non-Continuation Decisions and Department Directives are agency actions subject to review under the APA.

149. The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

---

[11] Even if these new priorities had been subject to notice and comment, they could not have justified the Non-Continuation Decisions, which can only be premised on performance, financial, and related metrics. *See* 34 C.F.R. § 74.253(b); *supra* Section I.C.

27

150. The Non-Continuation Decisions were arbitrary and capricious because Defendants violated the "[t]he change-in-position doctrine," which prevents agencies from "mislead[ing] regulated entities," *FDA v. Wages & White Lion Invs., LLC.*, 604 U.S. 542, 567 (2025).

151. The NIA Packages, when they were released in 2021, 2022, and 2024, contained absolute priorities and competitive preference priorities and set forth the legal authority for these priorities. *See supra*, Section II.A. The Department required Plaintiff States to address the absolute priorities in their applications and gave them the option to address the competitive preference priorities.

152. Plaintiff States' applications complied with these directives and addressed, at a minimum, the absolute priorities.

153. The Department approved each Plaintiff State's application and awarded each Plaintiff State a five-year SPDG grant.

154. Plaintiff States relied on and complied with the approved grant proposals throughout the relevant period, including execution of the absolute priorities as discussed in their applications. *See Washington*, 813 F. Supp. 3d at 1238 ("Grantees structured their project goals and budgets to conform to the department's published priorities, which they reasonably believed, consistent with the regulations and Department guidance, would help them obtain continued funding.").

155. Notwithstanding Plaintiff States' compliance with the lawfully enacted program priorities and the related programs described in their grant proposals, Defendants arbitrarily and capriciously discontinued Plaintiff States' grants based on new unpublished priorities. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious if not "based on a consideration of the relevant factors").

156. The Non-Continuation Decisions also violated the change-in-position doctrine because Defendants failed to account for the "serious reliance interests" of Plaintiff States and their institutions in making this change in policy. *Wages & White Lion Invs.*, 604 U.S. at 567; *see*

*also Motor Vehicle Mfrs.*, 463 U.S. at 43 (1983) (agency action is arbitrary and capricious if the agency "failed to consider an important aspect of the problem").

157. Plaintiff States developed their budgets with the understanding that Defendants would evaluate annual continuation awards based on Plaintiffs' "meeting performance targets established at the beginning of the project." *Discretionary Grantmaking* at 31–32.

158. Plaintiff States' reliance was based on Defendants' history and practice under the SPDG programs, as well as departmental regulations confirming Defendants' "intention to make continuation awards to fund the remainder of the project period" upon approval of Plaintiffs' multi-year grants, 34 C.F.R. § 75.251(b)(2), and prioritization of "continuation awards over new grants," 34 C.F.R. § 75.253(c); *see also, e.g.*, Direct Grant Programs, 59 Fed. Reg. 30258, 30259 (June 10, 1994) (explaining that a cut-off in continuation award funding is "extremely rare in practice"); Education Department General Administrative Regulations and Related Regulatory Provisions, 89 Fed. Reg. 70300, 70316 (Aug. 29, 2024) (explaining that, "[i]n general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance").

159. Defendants also violated the change-in-position doctrine because the NIA Packages required applicants to explain how the proposed project would satisfy the GEPA Equity Directive and certain regulatory selection criteria, drawn from EDGAR, including: "the extent to which the applicant encourages applications for employment from persons who are members of groups that have traditionally been underrepresented based on race, color, national origin, gender, age, or disability" and "[h]ow the applicant will ensure that a diversity of perspectives are brought to bear in the operation of the proposed project." S*ee* 34 C.F.R. §§ 75.210(e)(2), (g)(2)(V); *see also* Applications for New Awards; SPDGs, 85 Fed. Reg. 85616, 85623 (Dec. 29, 2020); Applications for New Awards; SPDGs, 87 Fed. Reg. 35525, 35531–32 (June 10, 2022); Applications for New Awards; SPDGs, 89 Fed. Reg. 56356, 56362, 56365 (July 9, 2024).

160. Plaintiff States sought to fulfill these criteria by describing various equity-related initiatives, but Defendants then discontinued Plaintiff States' grants based on those very same initiatives.

161. The Non-Continuation Decisions were also arbitrary and capricious because they failed to provide a reasoned explanation for the discontinuation. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Motor Vehicle Mfrs.*, 463 U.S. at 43 (agency action is arbitrary and capricious if stated rationale "runs counter to the evidence before the agency" or lacks a "reasoned basis").

162. The Non-Continuation Decisions all included a boilerplate, disjunctive list of potential grounds for discontinuation. The Decisions then quoted one to two sentences from the underlying applications and asserted generically that the Department determined that the activities "conflict[ed] with the Department's policy of prioritizing merit, fairness, and excellence in education." But the Decisions did not explain how the quoted passages conflicted with the Administration's priorities, or whether the Department considered grantee performance (as documented in Plaintiff States' report submissions) as required by 34 C.F.R. § 75.253(b). The Decisions thus failed to offer "'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

163. Finally, the Non-Continuation Decisions were arbitrary and capricious because the Department did not apply the same standards to all SPDG program grants in deciding which grants to discontinue. Defendants have permitted other SPDG grants for other States to continue, yet those grants are a part of the same programs, were awarded using the same application criteria, and necessarily reflect the same prior Administration's priorities and policy preferences as Plaintiff States' grants. Mark Lieberman, *Trump Cancelled Millions for Special Education Teacher Training. What's Next?,* EducationWeek (Sept. 8, 2025), https://www.edweek.org/teaching-learning/trump-canceled-millions-for-special-education-teacher-training-whats-next/2025/09 ("The department terminated the awards of a small fraction of grantees from five separate IDEA Part D funding streams . . .").

164. Defendants' Non-Continuation Decisions, and the Department Directives as applied to the SPDG program, have caused and are causing substantial injury, including irreparable harm.

Complaint for Declaratory and Injunctive Relief

Plaintiff States invested time and resources that have been lost as a result of these discontinuances. Plaintiff States have been unable to find replacement funding for the programs.

165. Pursuant to 5 U.S.C. §, 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to an order and judgment, and to a permanent injunction, holding unlawful and vacating Defendants' Non-Continuation Decisions and the Department Directives as applied to the SPDG program, and enjoining Defendants from maintaining or reinstating the Non-Continuation Decisions and the Department Directives as applied to the SPDG program.

**COUNT IV**

**SPENDING CLAUSE**

166. Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

167. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

168. The Spending Clause of the U.S. Constitution, Article I, Section 8, Clause 1, provides that Congress—not the Executive—"shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ."

169. The Spending Clause requires States to have fair notice of the conditions that apply to the disbursement of funds. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18, 25 (1981); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583–84 (2012). Agencies must set out funding conditions "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). This requirement flows from the Spending Clause principle that States must "voluntarily and knowingly" accept conditions attached to federal spending. *Id.* (quoting *Pennhurst*, 451 U.S. at 17). States "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id*. (quoting *Pennhurst*, 451 U.S. at 17). The requirement of unambiguous conditions "enable[s] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17.

31

Complaint for Declaratory and Injunctive Relief

170. Defendants' Non-Continuation Decisions and Department Directives altered the conditions upon which grants were obligated and funds disbursed, contrary to the Spending Clause. To provide grantees sufficient notice of the applicable conditions for these awards, the Department published priorities, requirements, and definitions in the Federal Register and identified them in the NIA Packages. *See, e.g.*, Final Priorities and Definitions; SPDGs, 77 Fed. Reg. 45944 (Aug. 2, 2012); Final Priority and Definitions—SPDGs, 85 Fed. Reg. 45525 (July 29, 2020). Plaintiff States designed their projects to meet the priorities announced in the year they applied. Plaintiff States accepted their grant awards with the understanding that they would be held to, and evaluated against, the projects they proposed in their grant applications, and that the Department would prioritize Plaintiff States' continuation awards over new grant awards. *See* 34 C.F.R. § 75.253(c). But Defendants then abruptly altered these conditions in the Non-Continuation Decisions by imposing new priorities without notice.

171. Defendants' Non-Continuation Decisions and Department Directives also amount to a new and retroactive condition on SPDG funding, as Defendants now assert authority to unilaterally discontinue a federal grant on grounds not authorized by IDEA, GEPA, or 34 C.F.R. § 75.253. These conditions are retroactive, ambiguous, and inconsistent with the final SPDG priorities issued pursuant to GEPA and 34 C.F.R. § 75.105(b).

172. Defendants' Non-Continuation Decisions and the Department Directives as applied to the SPDG program have caused and are causing substantial injury, including irreparable harm.

173. Plaintiff States are entitled to a permanent injunction barring Defendants from maintaining or reinstating the Non-Continuation Decisions and the Department Directives as applied to the SPDG program, and to a declaration pursuant to 28 U.S.C. § 2201 declaring unconstitutional the Non-Continuation Decisions, the Department Directives as applied to the SPDG program, and any actions taken to enforce or implement them.

Complaint for Declaratory and Injunctive Relief

## COUNT V

## EQUITABLE *ULTRA VIRES*

### Conduct Outside the Scope of Statutory Authority Conferred on the Executive

174. Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

175. Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

176. The Department, through its officials, may exercise only the authority conferred by statute and regulations.

177. Defendants do not have authority to discontinue Plaintiff States' grants based on a change in priorities after grants were issued in accordance with IDEA and GEPA, following statutorily required notice and comment process. Defendants' Non-Continuation Decisions and Department Directives, without regard to GEPA notice and comment procedures or the Department's own regulations, are contrary to law and outside of Defendants' authority.

178. To the extent Defendants' Non-Continuation Decisions discontinued Plaintiff States' grants by placing new, retroactive, and unrelated conditions on the grants, Defendants encroached upon Congress's Spending Clause authority and violated the separation of powers, and thereby acted *ultra vires*.

179. Defendants' Non-Continuation Decisions and the Department Directives as applied to the SPDG program have caused and are causing substantial injury to Plaintiff States, including irreparable harm.

180. Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Defendants' Non-Continuation Decisions and the Department Directives as applied to the SPDG program are *ultra vires* and therefore unlawful.

33

181. Plaintiff States are also entitled to a permanent injunction barring Defendants from maintaining or reinstating the Non-Continuation Decisions or the Department Directives as applied to the SPDG program.

## COUNT VI

## DECLARATORY JUDGMENT

182. Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

183. An actual and substantial controversy exists between Plaintiff States and Defendants about whether Defendants are permitted to consider new, unpublished agency priorities—such as the Department Directives—when determining if Plaintiff States meet the requirements to receive a continuation award under 34 C.F.R. § 75.253(a).

184. This action is presently justiciable because Defendants have discontinued Plaintiff States' multi-year grants under 34 C.F.R. § 75.253 based on an alleged conflict with the current Administration's priorities and policies, and then immediately awarded those program funds to new grantees based on the new priorities. Mark Lieberman, *Most—But Not All—Imperiled Federal Grants for Special Education Will Continue*, EducationWeek (Sept. 5, 2025), https://www.edweek.org/teaching-learning/most-but-not-all-imperiled-federal-grants-for-special-education-will-continue/2025/09 ("non-continued grant funds are not being cut; they are being re-invested into high-quality programs that better serve special needs students").

185. Plaintiff States assert that under 34 C.F.R. § 75.253(b), Defendants may not assess a grantee's performance against the Department Directives or other new agency priorities. Additionally, Defendants' reliance on new priorities fails to give precedence to continuation awards over new grants, in violation of 34 C.F.R. § 75.253(c).

186. Declaratory relief will clarify the rights and obligations of the parties under GEPA and the Department's grant regulations (including 34 C.F.R. § 75.253) and, therefore, pursuant to 28 U.S.C. § 2201, such relief is appropriate to resolve this controversy.

Complaint for Declaratory and Injunctive Relief

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff States California, Rhode Island, and Wisconsin respectfully request that this Court enter judgment in their favor and grant the following relief:

1.    Pursuant to 5 U.S.C. § 706(2), hold unlawful, set aside, and vacate Defendants' Non-Continuation Decisions and actions to effectuate them, as well as the Department Directives as applied to the SPDG program;

2.    Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that (1) Defendants' Non-Continuation Decisions and actions to effectuate them and (2) the Department Directives as applied to the SPDG program, are unlawful because they violate the APA and the Constitution, and are *ultra vires*;

3.    Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that 34 C.F.R. § 74.253(a) does not authorize the Department to discontinue multi-year awards based on a priority that was not subject to notice-and-comment rulemaking under the APA and GEPA, or that was not identified as a priority in the Notice Inviting Applications;

4.    Issue permanent injunctive relief ordering the Department to make new continuation award decisions—consistent with the orders, vacaturs, and declarations identified above—by a date certain to be ordered by the Court;

5.    Award Plaintiff States reasonable costs and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

6.    Grant such other and further relief as the Court deems just and proper.

Complaint for Declaratory and Injunctive Relief

Dated: June 9, 2026                                          Respectfully submitted,


**ROB BONTA**                                          **PETER F. NERONHA**
Attorney General of California                    Attorney General of Rhode Island
MICHAEL L. NEWMAN                                KYLA DUFFY
Senior Assistant Attorney General           Special Assistant Attorney General
CHRISTINE CHUANG
IRINA TRASOVAN
Supervising Deputy Attorneys General        /s/ *Kyla Duffy*
JESSE BASBAUM                                          KYLA DUFFY*
BEN CONWAY                                             Special Assistant Attorney General
ELIA HERRERA                                           150 South Main Street
EMILIA P. E. MORRIS                                Providence, RI 02903
Deputy Attorneys General                         Telephone: (401) 274-4400
                                                                E-mail: Kduffy@riag.ri.gov

/s/ *Jesse Basbaum*                                  *Attorneys for Plaintiff State of Rhode Island*
JESSE BASBAUM
Deputy Attorney General
1515 Clay Street, Suite 2000
Oakland, CA 94612
Telephone: (510) 879-0280
E-mail: Jesse.Basbaum@doj.ca.gov

*Attorneys for Plaintiff State of California*


**JOSHUA L. KAUL**
Attorney General of Wisconsin
AARON J. BIBB
Assistant Attorney General


/s/ *Aaron J. Bibb*
AARON J. BIBB*
Assistant Attorney General
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-0810
E-mail: aaron.bibb@wisdoj.gov

*Attorneys for Plaintiff State of Wisconsin*


* *pro hac vice forthcoming*

36

Complaint for Declaratory and Injunctive Relief

# Exhibit A

UNITED STATES DEPARTMENT OF EDUCATION

WASHINGTON, D.C. 20202

**Directive on Department Grant Priorities**

Agency: U.S. Department of Education

Office of Planning, Evaluation and Policy Development (OPEPD)

Action: Directive

**FOR FURTHER INFORMATION CONTACT:**

U.S. Department of Education
Office of Planning, Evaluation and Policy Development

EFFECTIVE DATE:  February 5, 2025.

**Eliminating Discrimination and Fraud in Department Grant Awards**

From the Supreme Court's 1954 landmark opinion in *Brown v. Board of Education* to its 2023 decision in *Students for Fair Admissions, Inc. v. Fellows of Harvard College*, education has played a central role in this Nation's fight against discrimination. It remains a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. This includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

For these reasons, pursuant to, among other authorities, 20 U.S.C. § 3411 and 2 C.F.R. § 200.339–341, the Secretary of Education hereby directs as follows:

> **Department personnel shall conduct an internal review of all new grant awards, grants that have not yet been awarded to specific individuals or entities (e.g., notices of funding opportunities), and issued grants.  Such review shall be limited to ensuring that Department grants do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication.**

This Directive shall be implemented by all ED personnel, including but not limited to those in the **Office of Planning, Evaluation and Policy Development's** Grants Policy Office, Office of Finance and Operations' Office of Grants Management, Office of Elementary and Secondary Education, Office of Postsecondary Education, Office of Special Education and Rehabilitative Services,

Office of Career, Technical and Adult Education, Office of English Language Acquisition, Institute for Education Sciences, and the Office of Discretionary Grants and Support Services, who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument.  Grants deemed inconsistent with these priorities shall, where permitted by applicable law, be terminated in compliance with all notice and procedural requirements in the relevant award, agreement, or other instrument. *See* 2 C.F.R. § 200.340(a)(4)–341.

Notwithstanding this Directive, any disbursements on open grant awards paused due to Office of Management and Budget Memorandum M-25-13 or any Executive Order underlying that Memorandum shall be immediately released.

Authority: 20 U.S.C. § 3411; 2 C.F.R. § 200.339–341.
Dated: February 5, 2025.

Denise L. Carter,
Acting Secretary of Education

# Exhibit B



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF PLANNING, EVALUATION AND POLICY DEVELOPMENT

**MEMORANDUM**

TO: OESE, OSERS, OPE, and OCTAE

FROM: Murray Bessette
Delegated the Authority to Perform the Functions and Duties of the Assistant
Secretary for the Office of Planning, Evaluation and Policy Development

SUBJECT: Non-Competing Continuation Discretionary Grant Award Review Policy

<u>Purpose</u>

The purpose of this memorandum is to provide guidance to program offices regarding the review criteria, consistent with the continuation award requirements articulated in 34 CFR §75.253, to be used in considering non-competing continuation (NCC) awards in discretionary grant portfolios and no cost extensions.

In evaluating NCC awards, program offices shall review grants to ensure that continuations are granted in the best interest of the federal government under 34 CFR §75.253(a)(5), which requires "a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." The Department will review all grant awards to advance the Administration's priorities of ensuring Federal funds do not support projects that: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.

Consistent with these requirements, program offices must act on any relevant information that may indicate that project activities are inconsistent with Federal civil rights requirements. As a general matter, grantees must not use federal funds in any manner that violates the United States Constitution, Title VI or Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq. or 42 U.S.C. § 2000e et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), section 504 of the Rehabilitation Act (29 U.S.C. § 794), or the Age Discrimination Act of 1975 (42 U.S.C. 6101 *et seq.*), Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12131 et seq.), and Boy Scouts of America Equal Access Act of 2001 (20 U.S.C. § 7905). To the extent that a grantee uses or has used grant funds in a manner that violates these laws, program offices must make appropriate recommendations, including denial of continuation funding and enforcement action which may include recovery of funds under section 452 of the General Education Provisions Act (GEPA).

In turn, discretionary grantees are responsible for ensuring compliance with Federal civil rights laws, as referenced in 34 CFR §75.500. Read together, a determination that making a continuation award is in the "best interest" of the Federal government necessitates a

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2110

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF PLANNING, EVALUATION AND POLICY DEVELOPMENT

consideration of whether grantees are operating projects in full compliance with Federal civil rights requirements. In making a determination, the Secretary may consider any "relevant information" regarding the grant under 34 CFR § 75.253(b).

Reviewing Grants for Discriminatory Activities

Program offices, in reviewing each discretionary grant award for an NCC award, shall review each grant to ensure that grant funds are not supporting any discriminatory activities, such as the following:

- Excluding participants based on race,
- Including participants based on race,
- Engaging in hiring or recruiting practices based on race,
- Engaging in racial balancing (i.e. efforts to achieve a specific racial composition in a grant project that reflects a community's racial makeup),
- Choosing program participants based on a race-based disparate impact analysis (i.e. practices seemingly neutral but adversely and disparately affect members of a racial group),
- Allowing males into female-only sports,
- Allowing males into female intimate spaces (e.g. bathrooms, locker rooms),
- Including or excluding participants based on sex unless permitted or required by Federal law or statute
- Using racial or sex quotas for the purpose of selecting participants.

Note that some grants may be engaging in discriminatory activities at the behest of system-wide policies (such as a university system's diversity hiring plan) or because of a State law or regulation (such as a State-required "minority hiring plan" for schools). Such circumstances, when they occur, must still be flagged for further review.

In performing this NCC review for discriminatory activities, program offices shall take into account all available information regarding the grant, including the approved grant application (inclusive of the GEPA 427 statement), annual performance and financial reporting, and all other "relevant information" regarding the grant under 34 CFR § 75.253(b).

Continuation or Non-continuation Recommendation

Program offices shall flag for further review any project that includes any activities, such as those listed above, that violate the United States Constitution, Title VI or Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq. or 42 U.S.C. § 2000e et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), section 504 of the Rehabilitation Act (29 U.S.C. § 794), or the Age Discrimination Act of 1975 (42 U.S.C. 6101 *et seq.*), Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12131 et seq.), and Boy Scouts of America

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2110

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF PLANNING, EVALUATION AND POLICY DEVELOPMENT

Equal Access Act of 2001 (20 U.S.C. § 7905). Program office leadership will then make a recommendation for continuation or non-continuation to OPEPD. In making a decision, OPEPD will take appropriate action, which may include non-continuation of the grant, recommending further investigation and enforcement action, and/or reviewing other grant award activity funded to the same grantee.

Please note this policy is effective from the date of issuance for all NCC award slates.

MURRAY BESSETTE
Digitally signed
by MURRAY
BESSETTE
Date: 2025.06.05
17:13:00 -04'00'

Murray Bessette
Senior Advisor
Delegated the Authority to Perform the Functions and Duties of the Assistant
Secretary for the Office of Planning, Evaluation and Policy Development
400 Maryland Ave. SW
Washington, DC 20202

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2110

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*