ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
CHRISTINE CHUANG
IRINA TRASOVAN
Supervising Deputy Attorneys General
JESSE BASBAUM (SBN 273333)
BEN CONWAY (SBN 246410)
ELIA HERRERA (SBN 293278)
EMILIA P. E. MORRIS (SBN 253681)
Deputy Attorneys General
1515 Clay Street, Suite 2000
Oakland, CA 94612
Telephone: (510) 879-0280
Fax: (916) 731-2129
E-mail: Jesse.Basbaum@doj.ca.gov
*Attorneys for Plaintiff State of California*

*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF RHODE ISLAND; AND STATE OF WISCONSIN,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES DEPARTMENT OF EDUCATION; AND LINDA MCMAHON, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF EDUCATION,**<br><br>**Defendants.** | Case No. 4:26-cv-05549-HSG<br><br>**PLAINTIFF STATES' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: February 18, 2026<br>Time: 2:00 p.m.<br>Dept: Ctrm. 2 — 4th Floor<br>Judge: Hon. Haywood S. Gilliam, Jr. |

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on February 18, 2026 at 2:00 p.m., or as soon thereafter as may be heard by the Honorable Haywood S. Gilliam, Jr. in Courtroom 2 of the United States District Court for the Northern District of California, 1301 Clay Street, Oakland, California 94612, Plaintiffs the State of California, the State of Rhode Island, and the State of Wisconsin (collectively, “Plaintiff States”) will and hereby do move the Court for partial summary judgment on the ground that there is no genuine issue as to any material fact and that Plaintiff States are entitled to judgment as a matter of law as to their claims under the Administrative Procedure Act and the Spending Clause.

Plaintiff States respectfully move for partial summary judgment on their claims under the Administrative Procedure Act (Counts I, II, and III) for the reason that the June 5, 2025 directive issued by Defendant the United States Department of Education (Department) that directed Department staff to review and discontinue any grants that do not “advance the Administration’s priorities” (the “June Directive”) is contrary to law, without observance of procedure required by law, and arbitrary and capricious. Plaintiff States further move for partial summary judgment on their claim under the Spending Clause (Count IV) on the grounds that the June Directive violates the Spending Clause because it is impermissibly retroactive and ambiguous. As a result, Plaintiff States are entitled to a vacatur of the June Directive, a declaratory judgment declaring that the procedures underlying the June Directive are unlawful, and a permanent injunction enjoining the Department from implementing the June Directive and the procedures underlying it.

This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the declarations of Jesse Basbaum, Rachel Heenan, Barbara Van Haren and Lisa Foehr, all pleadings and papers on file in this action, including the Administrative Record filed by Defendants, and upon such other matters as may be presented to the Court.

Dated: November 2, 2026

Respectfully submitted,

**ROB BONTA**
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
CHRISTINE CHUANG
IRINA TRASOVAN
Supervising Deputy Attorneys General
JESSE BASBAUM
BEN CONWAY
ELIA HERRERA
EMILIA P. E. MORRIS
Deputy Attorneys General

/s/ *Jesse Basbaum*
Jesse Basbaum
Deputy Attorney General
1515 Clay Street, Suite 2000
Oakland, CA 94612
Telephone: (510) 879-0280
E-mail: Jesse.Basbaum@doj.ca.gov

*Attorneys for Plaintiff State of California*

**JOSHUA L. KAUL**
Attorney General of Wisconsin
AARON J. BIBB
Assistant Attorney General

/s/ *Aaron J. Bibb*
AARON J. BIBB*
Assistant Attorney General
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-0810
E-mail: aaron.bibb@wisdoj.gov

*Attorneys for Plaintiff State of Wisconsin*

**PETER F. NERONHA**
Attorney General of Rhode Island
KYLA DUFFY
Special Assistant Attorney General

/s/ *Kyla Duffy*
Kyla Duffy*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone (401) 274-4400
E-mail: Kduffy@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

*appearing *pro hac vice*

## TABLE OF CONTENTS

Page


INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

- I. The Department's Administration of Multi-year Grants ........ 2
  - A. President Trump's Anti-DEI Executive Orders and the Department's Unlawful Grant Review Directives. ........ 4
- II. Discontinuation of Plaintiff States' SPDG Grants ........ 6
  - A. The Department's Notices Inviting Applications Called for Plaintiff States to Include DEI Initiatives in Their Applications. ........ 7
  - B. Plaintiff States Applied for and Received SPDG Grants Using Applications that Described the Required Equity Initiatives. ........ 9
  - C. The Department Discontinued Plaintiff States' Grants Based on the June Directive. ........ 11
- III. The Prior, Ongoing, and Imminent Harm Caused by The June Directive ........ 12

LEGAL STANDARD ........ 13

ARGUMENT ........ 14

- I. Plaintiff States Have Standing ........ 14
- II. The June Directive Violates the APA ........ 16
  - A. The Directive is Final Agency Action. ........ 16
  - B. The June Directive is Contrary to Law and Without Observance of Procedure Required by Law. ........ 17
    - 1. The June Directive violates GEPA's rulemaking requirement. (Counts I and II) ........ 18
    - 2. The June Directive violates the Department's continuation regulations. (Count I) ........ 20
    - 3. The June Directive conflicts with the equity directives of IDEA and GEPA. (Count I) ........ 21
  - C. The June Directive and its Implementation are Arbitrary and Capricious (Count III). ........ 23
    - 1. The Department changed positions without justification. ........ 24
    - 2. The Department changed positions without considering extensive reliance interests. ........ 26
- III. The June Directive Violates the Spending Clause (Count IV) ........ 27
- IV. Plaintiff States are entitled to Vacatur, Declaratory Relief, and Injunctive Relief ........ 29
  - A. Plaintiff States Are Entitled to Vacatur of the June 2025 Directive. ........ 29
  - B. Plaintiff States Are Entitled to Declaratory Relief. ........ 30
  - C. Plaintiff States Are Entitled to Injunctive Relief. ........ 30

## TABLE OF CONTENTS
(continued)

Page


1. Plaintiff States Have Suffered and Will Continue to Suffer Irreparable Harm. .... 31
2. Remedies at Law are Inadequate.... 32
3. The Balance of Hardships and Public Interest Favors Plaintiff States. .... 32

CONCLUSION .... 33

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*
770 F. Supp. 3d 822 (D. Md. 2025) .......... 19

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*
548 U.S. 291 (2006) .......... 27, 28

*Armstrong v. Exceptional Child Ctr., Inc.*
575 U.S. 320 (2015) .......... 14

*Ass'n of Am. Univs. v. Dep't of Def.*
792 F. Supp. 3d 143 (D. Mass 2025) .......... 33

*Aubin v. Bonta*
665 F. Supp. 3d 1097 (N.D. Cal. 2023) .......... 32

*Battle v. FAA*
393 F.3d 1330 (D.C. Cir. 2005) .......... 20

*Bd. of Educ. of City Sch. Dist. of City of New York v. U.S. Dep't of Educ.*
No. 25-CV-08547, 2026 WL 948205 (S.D.N.Y. Apr. 8, 2026) .......... 5, 19, 22

*Bennett v. Spear*
520 U.S. 154 (1997) .......... 16

*Biden v. Texas*
597 U.S. 785 (2022) .......... 17

*Bilbrey by Bilbrey v. Brown*
738 F.2d 1462 (9th Cir. 1984) .......... 30

*California v. U.S. Dep't of Educ.*
132 F.4th 92 (1st Cir. 2025) .......... 15

*City & Cnty. of San Francisco v. Sessions*
349 F. Supp. 3d 924 (N.D. Cal. 2018) .......... 29

*City of Los Angeles v. Barr*
929 F.3d 1163 (9th Cir. 2019) .......... 28

*Cnty. of King v. Turner*
189 F.4th 819 (9th Cir. 2026) .......... 31

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*
603 U.S. 799 (2024) .......... 29

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Council for Opportunity in Educ. v. U.S. Dep't of Educ.*
No. 1:25-CV-03491-TSC, 2026 WL 120984 (D.D.C. Jan. 16, 2026) .......................... 5, 8, 22

*Dep't of Com. v. New York*
588 U.S. 752 (2019) .......................... 14

*Dep't of Educ. v. Brown*
600 U.S. 551 (2023) .......................... 16

*Dep't of Educ. v. California*
604 U.S. 650 (2025) .......................... 15

*DHS v. Regents of the Univ. of Cal.*
591 U.S. 1 (2020) .......................... 23, 26

*eBay Inc. v. MercExchange, L.L.C.*
547 U.S. 388 (2006) .......................... 31

*Encino Motorcars, LLC v. Navarro*
579 U.S. 211 (2016) .......................... 26

*FCC v. Fox Television Stations, Inc.*
556 U.S. 502 (2009) .......................... 23, 26

*FDA v. Wages & White Lion Invs., L.L.C.*
604 U.S. 542 (2025) .......................... 20, 23

*Gen. Elec. Co. v. EPA*
290 F.3d 377 (D.C. Cir. 2002) .......................... 17

*Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*
41 F.4th 564 (D.C. Cir. 2022) .......................... 19

*Kern Cnty. Farm Bureau v. Allen*
450 F.3d 1072 (9th Cir. 2006).......................... 19

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992) .......................... 14

*Massachusetts v. Nat'l Insts. of Health*
770 F. Supp. 3d 277 (D. Mass. 2025) .......................... 33

*Michigan v. DeVos*
481 F. Supp. 3d 984 (N.D. Cal. 2020) .......................... 31

## TABLE OF AUTHORITIES
**(continued)**

**Page**

*Montana Wildlife Fed. v. Haaland*
127 F.4th 1 (9th Cir. 2025)........................................................................................ 29

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983)...................................................................................................... 23

*NAACP v. Trump*
298 F. Supp. 3d 209 (D.D.C. 2018)........................................................................... 19

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
567 U.S. 519 (2012).................................................................................................... 28

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*
145 S. Ct. 2658 (2025)........................................................................................... 16, 29

*New Jersey v. U.S. Off. of Mgmt. & Budget*
837 F. Supp. 3d 258 (D. Mass. July 17, 2026).......................................................... 15

*New York v. U.S. Dep't of Health & Hum. Servs.*
414 F. ........................................................................................................................ 27

*New York v. U.S. Dep't of Just.*
804 F. Supp. 3d 294 (D.R.I. Sept. 10, 2025)............................................................. 28

*Nieves-Márquez v. Puerto Rico*
353 F.3d 108 (1st Cir. 2003)....................................................................................... 28

*Nken v. Holder*
556 U.S. 418 (2009).................................................................................................... 32

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*
18 F.3d 1468 (9th Cir. 1994)....................................................................................... 13

*Occidental Eng'g Co. v. INS*
753 F.2d 766 (9th Cir. 1985)....................................................................................... 13

*Pennhurst State Sch. & Hosp. v. Halderman*
451 U.S. 1 (1981)........................................................................................................ 28

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health and Hum. Servs.*
328 F. Supp. 3d 1133 (E.D. Wash. 2018)................................................................... 31

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*
128 F.4th 1089 (9th Cir. 2025).................................................................................... 16

## TABLE OF AUTHORITIES
**(continued)**

**Page**


*Rhode Island v. Trump*
810 F. Supp. 3d 283 (D.R.I. 2025) ........ 17

*Saliba v. SEC*
47 F.4th 961 (9th Cir. 2022) ........ 16

*San Francisco Unified Sch. Dist. v. AmeriCorps*
789 F. Supp. 3d 716 (N.D. Cal. 2025) ........ 22, 28, 29

*Scholl v. Mnuchin*
494 F. Supp. 3d 661 (N.D. Cal. 2020) ........ 14

*South Dakota v. Dole*
483 U.S. 203 (1987) ........ 27

*State of California v. U.S. Dep't of Educ.*
-- F. Supp. 3d --, No. 1:25-cv-10548-AK, 2026 WL 2754968 (D. Mass. Sept. 17, 2026) ........ *passim*

*Texas v. Cardona*
743 F. Supp. 3d 824 (N.D. Tex. 2024) ........ 17

*Washington v. U.S. Dep't of Educ.*
No. C26-2409-KKE, 2026 WL 2836972 (W.D. Wash. Sept. 22, 2026) ........ 22

*Washington v. U.S. Dep't of Educ.* (*Washington I*)
813 F. Supp. 3d 1222 (W.D. Wash. 2025) ........ *passim*

*Washington v. U.S. Dep't of Educ.* (*Washington II*)
167 F.4th 1241 (9th Cir. 2026) ........ 5, 17, 18

*Yurok Tribe v. U.S. Bureau of Reclamation*
231 F. Supp. 3d 450 (N.D. Cal. Feb. 8, 2017) ........ 15

**Constitutional Provisions**

U.S. Constitution Article I
§ 8, cl. 1 ........ 27

**Statutes**

United States Code, Title 5
§ 553 ........ 2, 3, 18
§ 702 ........ 30
§ 703 ........ 30
§ 706 ........ 14, 17, 29

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

United States Code, Title 20
§ 1221e-4 .......... 2, 6, 18
§ 1228a .......... 8, 22
§ 1232 .......... 2, 6, 18
§ 1234d .......... 22
§ 1234i .......... 22
§ 1400 .......... 6, 22, 29
§ 1451 .......... 6
§ 1453 .......... 6
§ 1682 .......... 22

United States Code, Title 28
§ 2201 .......... 30

United States Code, Title 42
§ 2000d-1 .......... 22

COURT RULES

Federal Rules of Civil Procedure 56(a) .......... 14

FEDERAL REGULATIONS

Code of Federal Regulations Title 34
§ 75.100 .......... 3, 19
§ 75.101 .......... 3, 19
§ 75.105 .......... 3
§ 75.110 .......... 3
§ 75.118 .......... 3, 19
§ 75.200 .......... 2
§ 75.201 .......... 3
§ 75.210 .......... *passim*
§ 75.251 .......... 3, 24
§ 75.253 .......... *passim*
§§ 81.1–.45 .......... 22
§§ 100.8–11 .......... 22

OTHER AUTHORITIES

45 Fed. Reg. 22494, 22559 (Apr. 3, 1980) .......... 3

59 Fed. Reg. (June 10, 1994)
30258, 30258 .......... 3
30259 .......... 3, 4, 24, 27

## TABLE OF AUTHORITIES
**(continued)**

**Page**

85 Fed. Reg. (Dec. 29, 2020)
85616 .... 7
85623 .... 25, 26

87 Fed. Reg. (June 10, 2022)
35525 .... 7
35526 .... 25
35531–32 .... 26

89 Fed. Reg. (July 9, 2024)
56211, 56214 .... 25
56356 .... 7
56362, 56365 .... 26

89 Fed. Reg. (Aug. 29, 2024)
70300, 70316 .... 4
70316 .... 24

Executive Order 14151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025) .... 4

Executive Order No. 14173, 90 Fed. Reg. 8633, 8635 (Jan. 21, 2025) .... 4

Executive Order No. 14190, 90 Fed. Reg. 8853, 8854 (Jan. 29, 2025) .... 4

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This matter arises from ongoing efforts by the current Administration to cancel grants due to diversity, equity, and inclusion (DEI) programming. On June 5, 2025, the Department of Education (Department) issued guidance directing staff to review and discontinue any grants that do not "advance the Administration's priorities" ("June Directive" or "Directive"). The implementation of the June Directive has confirmed that those priorities are, in essence, to eradicate all programs that include any form of DEI—even though applicable statutes, Department regulations, and longstanding agency practice have all required grantees to implement equity initiatives.

The June Directive also upended the way funding decisions are made: Historically, and as required by regulation, the Department awarded yearly continuations of existing grants based solely on the grantee's performance and fulfillment of priorities that had been set at the time the grant was initially awarded. But the June Directive requires Department staff to assess existing grants based on its new anti-DEI priorities, and even permits discontinuations based on equity-related statements that grantees were *required* to include in their original applications. For example, in 2025 the Department discontinued State Personnel Development Grants (SPDG) in each of Plaintiff States, which had funded critical initiatives to support children with disabilities. The grants were discontinued solely because, in applications each Plaintiff State submitted years ago, they discussed basic equity initiatives that are required by federal law.

The Directive has not only altered decades of Department procedures and priorities—and resulted in the cancellation of millions of dollars to fund programming for vulnerable students—but it also violates the Administrative Procedure Act (APA) in several respects. First, the Directive relies on unpublished priorities that were not subject to the notice-and-comment procedures required by the General Education Provisions Act (GEPA), the Department's own regulations, and the APA itself. Second, the Directive misapplies the regulation governing continuations, 34 C.F.R. § 75.253(a)(5), by construing the "best interest" provision to grant nearly limitless discretion to discontinue grants based on new priorities. Third, the Directive conflicts

with congressional equity mandates in both the Individuals with Disabilities Education Act (IDEA) and GEPA. Fourth, the Directive changed the Department's positions without justification and without considering extensive reliance interests: for years, the Department required Plaintiff States to implement equity initiatives, but then, pursuant to the June Directive, discontinued grants based on the same initiatives. For these and related reasons, the Directive violates the APA because it is contrary to law, without observance of procedure required by law, and arbitrary and capricious. Finally, the Directive violates the Spending Clause because it imposes impermissibly retroactive and ambiguous conditions.

Because the Directive is unlawful many times over, it should be vacated. The Court should also issue declaratory and injunctive relief to redress the Directive's ongoing harms and to preclude the Department from implementing equivalent guidance or procedures.

## FACTUAL BACKGROUND

### I. THE DEPARTMENT'S ADMINISTRATION OF MULTI-YEAR GRANTS

The Department administers grants pursuant to: (1) the statute authorizing the grant program, (2) GEPA, and (3) the Department's financial assistance regulations. Any rule affecting the Department's financial assistance must go through the APA's notice-and-comment process. *See* 20 U.S.C. § 1232; *see also* 20 U.S.C. § 1221e-4; 5 U.S.C. § 553. Accordingly, the Department has promulgated rules for: (1) the competitive selection process for new grants; and (2) the process for determining whether to continue a grantee's multi-year project. 34 C.F.R. § 75.200 (outlines selection process for new grants); *id.* § 75.253 (governs determination of grant continuations).

**Grant Selection Process.** When the Department announces a competition for new grants for a particular fiscal year, it publishes an application notice in the Federal Register that explains, among other things: how to apply for a new grant; whether the Secretary plans to approve multi-year projects and, if so, the project period that will be approved; the "annual priorities" established for the selection of new grants for the program that year, as well as any "competitive preference" priorities for which an application could receive bonus points; the selection criteria and factors used to decide which applications will be awarded new grants and how the criteria

will be weighed; and any program performance measurements. *See* 34 C.F.R. §§ 75.100, 75.101, 75.105, 75.110, 75.201; *see also* Decl. of Rachel Heenan (Heenan Decl.) ¶ 5; Decl. of Lisa Foehr (Foehr Decl.) ¶¶ 5-6; Decl. of Barbara Van Haren (Van Haren Decl.) ¶ 7. The Secretary must identify the specific priorities relevant to the application for a competitive federal grant program, 34 C.F.R. § 75.105(b)(1), and must do so through the rulemaking process. *See* 34 C.F.R. § 75.105(b)(2); 5 U.S.C. § 553. When awarding multi-year projects, the Department funds the initial budget period (usually 12 months) and "indicates [its] intention to make continuation awards to fund the remainder of the project period." 34 C.F.R. § 75.251.

**Grant Continuation Process.** The Department's process for determining whether to continue multi-year grants is not competitive and differs in several respects from the process for awarding new grants.

First, to be continued, multi-year projects do not go through an application process in which priority weights are assigned to competing applicants. *See* 34 C.F.R. § 75.118; Direct Grant Programs, 59 Fed. Reg. 30258, 30258 (June 10, 1994) (to be codified at 34 C.F.R. pt. 75) (eliminating application requirement for continuation awards). Rather than reviewing an application, the Department may consider only information relevant to a grantee's performance for that year, including performance reports, performance measures, and financial data. *See* 34 C.F.R. §§ 75.118, 75.253(b). As the Department recently stated, "the continuation award decision—including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application." Direct Grant Programs, 59 Fed. Reg. at 30259.

Second, the Department assigns priority to continuation awards over new grants, 34 C.F.R. § 75.253(c), and "[a] grantee does not have to compete with other applicants to receive [a continuation] award." Decl. of Jesse Basbaum (Basbaum Decl.), Ex. A at 45 (*Discretionary Grantmaking at ED* (2024)); Educational Division General Administrative Regulations (EDGAR), 45 Fed. Reg. 22494, 22559 (Apr. 3, 1980) (to be codified at 45 C.F.R. chs. I, XIV,

XV) (explaining that each "continuation award will be judged on the basis of the criteria in [34 C.F.R. § 75.253(a)] and will not be subject to competition with other applications").

Consistent with these regulations, the Department has long represented that a cut-off in continuation award funding is "extremely rare in practice." Direct Grant Programs, 59 Fed. Reg. at 30259. More recently, the Department explained: "In general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance and often cite no concerns if they do not receive a continuation award." EDGAR and Related Regulatory Provisions, 89 Fed. Reg. 70300, 70316 (Aug. 29, 2024). And until 2025, Plaintiff States found that their grant continuations were granted routinely and based on their performance. Heenan Decl. ¶ 7; Foehr Decl. ¶ 7; Van Haren Decl. ¶¶ 9, 26. Continuation decisions had never been based on whether a grant was compliant with a new Administration's priorities. *Id.*

### A. President Trump's Anti-DEI Executive Orders and the Department's Unlawful Grant Review Directives.

Shortly after his inauguration in 2025, President Trump issued a series of executive orders broadly seeking to end initiatives related to "equity" and any federal funding for such initiatives. For example, Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing" directs various departments to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025); *see also* Exec. Order No. 14173, 90 Fed. Reg. 8633, 8635 (Jan. 21, 2025) ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity"); Exec. Order No. 14190, 90 Fed. Reg. 8853, 8854 (Jan. 29, 2025) ("Ending Radical Indoctrination in K-12 Schooling").

On February 5, 2025, then-Acting Secretary of Education Denise Carter issued an internal directive titled "Eliminating Discrimination and Fraud in Department Grant Awards" (the "February Directive"). Basbaum Decl., Ex. B. The February Directive announced a new departmental priority to "ensur[e] that the Department's grants do not support programs or

organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic." *Id.* at 1. The February Directive also instructed that grants "deemed inconsistent with these priorities" should be terminated. *Id.* at 2.

The February Directive led to the termination or discontinuation of tens of millions in grant funding throughout the country, and those actions, as well as the February Directive itself, have been held unlawful by several courts. *See Washington v. U.S. Dep't of Educ.* (*Washington I*), 813 F. Supp. 3d 1222, 1245–46 (W.D. Wash. 2025) (vacating discontinuation decisions and prohibiting Department from relying on February Directive); *Washington v. U.S. Dep't of Educ.* (*Washington II*), 167 F.4th 1241, 1247 (9th Cir. 2026) (denying Department's motion to stay district court's order vacating discontinuation decisions); *Council for Opportunity in Educ. v. U.S. Dep't of Educ.*, No. 1:25-CV-03491-TSC, 2026 WL 120984, at *9–17 (D.D.C. Jan. 16, 2026) (granting preliminary injunction and staying discontinuations); *Bd. of Educ. of City Sch. Dist. of City of New York v. U.S. Dep't of Educ.*, No. 25-CV-08547, 2026 WL 948205, at *8 (S.D.N.Y. Apr. 8, 2026) (granting permanent injunction and vacating discontinuation determinations); *State of California v. U.S. Dep't of Educ.*, -- F. Supp. 3d --, No. 1:25-cv-10548-AK, 2026 WL 2754968, at *2 (D. Mass. Sept. 17, 2026) (declaring the February Directive unlawful).

During one of the many lawsuits challenging the February Directive, the Department claimed that the February Directive had been superseded by a new directive—issued internally on June 5, 2025 (the "June Directive"), but only disclosed to the public on June 1, 2026 in a failed effort to moot the challenges to the February Directive. *See* Decl. of Murray Bessette ¶ 5, *California v. U.S. Dep't of Educ.*, 2026 WL 2754968. The June Directive, which has since been produced by Defendants in the Administrative Record in this action, is titled "Non-Competing Continuation Discretionary Grant Award Review Policy." AR 001055–1057. Like the February Directive, the June Directive announced a new procedure directing program offices to review grants in connection with continuation decisions to "advance the Administration's priorities of ensuring Federal funds do not support projects that: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in

education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds." AR 001055. The June Directive further instructed program staff to rely on, among other things, underlying application materials to determine whether grants should be discontinued. AR 001056.

Neither the June Directive nor the priorities it announced were issued through notice-and-comment rulemaking. *Cf.* 20 U.S.C. §§ 1221e-4, 1232(a). At the time of its issuance, the Department did not circulate the June Directive to Plaintiff States or otherwise publicize them. Heenan Decl. ¶ 10; Foehr Decl. ¶ 10; Van Haren Decl. ¶ 12.

## II. Discontinuation of Plaintiff States' SPDG Grants

In September 2025, the June Directive was applied to Plaintiff States' grants under the State Personnel Development Grant (SPDG) program, resulting in the discontinuation of Plaintiff States' multi-year SPDG grants.

A primary objective of IDEA is to assist states in educating and supporting children with disabilities, 20 U.S.C. § 1400(d), and Congress established the SPDG program in 2004 to improve long-term outcomes for this vulnerable population. *See* 20 U.S.C. § 1451. The SPDG program awards competitive multi-year grants to assist state educational agencies "in reforming and improving their systems for personnel preparation and professional development in early intervention, educational, and transition services in order to improve results for children with disabilities." 20 U.S.C. §§ 1451(a), (c). Under IDEA, the Secretary "shall award" SPDG grants for each fiscal year. *See* 20 U.S.C. §§ 1451(c), (d). IDEA also requires SPDG grantees to submit annual performance reports to the Secretary that describe their progress and identify changes in strategies to improve their performance. 20 U.S.C. § 1453(d).

Plaintiff States had participated in the SPDG program in accordance with the Department's rules for years, including through annual submission of performance reports. Heenan Decl. ¶¶ 12, 13; Foehr Decl. ¶ 12; Van Haren Decl. ¶¶ 15, 16. Specific to the allegations in this action, Plaintiff States applied for and were awarded SPDG multi-year grants in 2021 (Rhode Island), 2022 (California), and 2024 (Wisconsin).

### A. The Department's Notices Inviting Applications Called for Plaintiff States to Include DEI Initiatives in Their Applications.

For each of Plaintiff States' SPDG grants, the Department published a notice inviting applications (NIA) in the Federal Register outlining the selection criteria for that year's application.[1] In connection with each NIA, the Department also circulated a grant application package (NIA Package). Heenan Decl. ¶ 15, Ex. A; Foehr Decl. ¶ 15, Ex. A; Van Haren Decl. ¶ 18, Ex. A. Each NIA identified at least two absolute priorities that applicants were required to address and also included either a third absolute priority and/or one or more competitive preference priorities. The NIAs also required applicants to explain how the proposed plans: (1) relied on effective and efficient delivery of professional development; and (2) met statutory requirements related to state personnel development plans, such as ensuring that "**economically disadvantaged [or poor] and minority children are not taught at higher rates by [unqualified] teachers**" and "provi[ding] training in how to teach and address the needs of children with different learning styles and **children who are English learners**." AR 000015–19 (emphasis added); AR 000333–336 (emphasis added); AR 000636–640 (emphasis added).

In addition, the NIAs identified five "selection criteria" from EDGAR. AR 000021–22; AR 000339–340; AR 000645–646; *see also* 34 C.F.R. § 75.210. In discussing one such criterion, the NIAs explained: "In determining the quality of project personnel, the Secretary considers the extent to which the applicant encourages applications for employment from persons **who are members of groups that have traditionally been underrepresented based on race, color, national origin, gender, age, or disability**." AR 000022 (emphasis added); AR 000339 (emphasis added); AR 000645 (emphasis added).[2] In discussing another criterion, the NIAs indicated that the Secretary would consider: "How the applicant will ensure that a **diversity of perspectives** are brought to bear in the operation of the proposed project, including those of parents, teachers, the business community, a variety of disciplinary and professional fields,

[1] AR 000015–24 (Applications for New Awards; State Personnel Development Grants, 85 Fed. Reg. 85616 (Dec. 29, 2020)); AR 000333–343 (Applications for New Awards; State Personnel Development Grants, 87 Fed. Reg. 35525 (June 10, 2022)); and AR 000636–647 (Applications for New Awards; State Personnel Development Grants, 89 Fed. Reg. 56356 (July 9, 2024)).

[2] This language tracked the EDGAR requirements of 34 C.F.R. § 75.210(e)(2).

recipients or beneficiaries of services, or others, as appropriate." AR 000022 (emphasis added); AR 000340 (emphasis added); AR 000645 (emphasis added).[3]

Finally, the Department explained that all applicants were required to address Section 427 of GEPA, commonly referred to as the "GEPA Equity Directive." *See* AR 000030–31; AR 00352–353; AR 001000–1002; *see also* 20 U.S.C. § 1228a(b); *Council for Opportunity in Educ.*, 2026 WL 120984, at *2. The GEPA Equity Directive requires all applicants for Department funding to include in applications "a description of the steps the applicant proposes to take to **ensure equitable access** to, and participation in, its federally-assisted program for students, teachers, and other program beneficiaries with special needs." 20 U.S.C. § 1228a (emphasis added). The Equity Directive requires applicants to explain how it will "overcome barriers to equitable participation, including **barriers based on gender, race, color, national origin, disability, and age**." 20 U.S.C. § 1228a(b) (emphasis added).

The Department specifically provided a "Notice to All Applicants," included with final SPDG grant applications, that included examples of how an applicant may comply with the Equity Directive by including DEI-focused programming. For example, the 2021 and 2022 notices stated: "An applicant that proposes to carry out an adult literacy project serving, among others, adults with limited English proficiency, might describe in its application how it intends to distribute a brochure about the proposed project to such potential participants in their native language. . . . [and] [a]n applicant that proposes a project to increase school safety might describe the special efforts it will take to address concerns of lesbian, gay, bisexual, and transgender students, and efforts to reach out to and involve the families of LGBT students." AR 000030; AR 000352. The 2024 notice was followed by multiple prompts requiring each applicant to describe how its "existing mission, policies, or commitments ensure equitable access . . . and equitable participation," identify "barriers [that] may impede equitable access and participation," and explain how those barriers would be addressed. AR 001000-1001.

[3] This language tracked the EDGAR requirements of 34 C.F.R. § 75.210(g)(2)(v).

### B. Plaintiff States Applied for and Received SPDG Grants Using Applications that Described the Required Equity Initiatives.

**Rhode Island.** On March 9, 2021, Rhode Island—through the Rhode Island Department of Elementary and Secondary Education (RIDE)—submitted an application with a 111-page narrative ("Rhode Island Narrative") in response to the 2021 NIA Package. AR 000040–150. Rhode Island's application addressed two absolute priorities of the 2021 NIA Package. AR 000040–41. According to the Rhode Island Narrative, RIDE's proposed plan sought to retain a quality special education workforce by equipping Rhode Island educators with knowledge, skills, and support to effectively implement evidence-based literacy instruction and multi-tiered systems of support that would improve literacy outcomes for children with or at-risk for disabilities. AR 000063. To address the GEPA Equity Directive, as required by law and by the 2021 NIA, RIDE's application included a separate GEPA Statement explaining how RIDE would seek to overcome barriers to equitable participation, Foehr Decl. ¶ 21, and discussed RIDE's partnerships with external groups as well as RIDE's internal Educators of Color Committee. AR 000031–32. The Rhode Island Narrative discussed the same equity-related initiatives to address the 2021 NIA's selection criteria related to "quality of project personnel," (criterion (c)). *Id.* Criterion (c) was based on the requirements of 34 C.F.R. § 75.210(e)(2).

On June 28, 2021, the Department approved Rhode Island's application for funding and granted a five-year award. Foehr Decl. ¶ 16. During the funded period, Rhode Island successfully met all program goals and performance requirements and timely submitted all required performance and financial reports. *Id.* ¶ 18.

**California.** On July 22, 2022, California—through the California Department of Education (CDE)—submitted an application with a 70-page narrative ("California Narrative") in response to the 2022 NIA. AR 000370–439. California addressed the absolute priorities and the competitive preference priority of the 2022 NIA. AR 000365–367. California sought funding to reform California systems for personnel development in early intervention, early education, and transition services to improve results for young children with disabilities or at risk for

developmental delays. AR 000377. CDE's state plan was designed to serve: (1) children with disabilities and children at risk for developmental delays, particularly in early intervention programs, preschool, and transitional kindergarten; (2) families navigating early intervention and preschool transitions; and (3) educators, education coaches, early childhood providers, administrators, and interagency partners. AR 000373, 000377–380. The California Narrative explained that the program would be administered by the Napa County Office of Education (NCOE), which would support the implementation of professional development, job-embedded coaching, and programs and activities designed to enhance the quality of personnel serving children with disabilities. AR 000360. To address the 2022 NIA's selection criteria related to "quality of project personnel" (criterion (c)), the California Narrative discussed NCOE's Diversity, Equity, and Inclusion (DEI) Committee. AR 000408. Criterion (c) was based on the requirements of 34 C.F.R. § 75.210(e)(2).

On September 29, 2022, the Department approved California's application for funding and granted a five-year award. Heenan Decl. ¶¶ 16, 17. During the funded period, California successfully met all program goals and performance requirements and timely submitted all required performance and financial reports. *Id.* ¶ 18.

**Wisconsin.** On August 22, 2024, Wisconsin—through the Wisconsin Department of Public Instruction (DPI)—submitted an application with a 75-page narrative ("Wisconsin Narrative") in response to the 2024 NIA. AR 000660–734. Wisconsin addressed all absolute priorities and two competitive preference priorities of the 2024 NIA. AR 000661. Wisconsin sought funding for Educators Forward, which is a partnership among DPI; Wisconsin's Department of Health Services and Department of Workforce Development; Wisconsin's Family Assistance Center for Education, Training, and Support; two state university special educator preparation programs; the Wisconsin Council of Administrators of Special Services; Wisconsin's twelve regional education service agencies; and small and mid-sized school districts throughout the state. *Id.* Educators Forward aims to improve outcomes for students with disabilities by increasing the number of well-qualified, fully certified special educators and to expand the ability of administrators to serve as instructional leaders who create a cooperative and inclusive environment through a multilevel

system of personnel development supports. AR 000656. To address the 2024 NIA's selection criteria related to "adequacy of resources and management plan" (criterion (d)), the Wisconsin Narrative discussed a statewide coaching program that incorporated equity principles to ensure effectiveness. AR 000720–721. Criterion (d) was based on the requirements of 34 C.F.R. § 75.210(g)(2)(V).

On October 1, 2024, the Department approved Wisconsin's application for funding. Van Haren Decl. ¶ 19. During the funded period, Wisconsin successfully met all program goals and performance requirements and timely submitted all required performance and financial reports. *Id.* ¶ 21.

### C. The Department Discontinued Plaintiff States' Grants Based on the June Directive.

On September 5, 2025,[4] the Department sent Plaintiff States nearly identical Notices of Non-Continuation of Grant Award ("Non-Continuation Decisions") explaining that SPDG funding would be discontinued in its entirety at the end of the operative budget period (September 30, 2025) because continuing the project would not be "in the best interest of the Federal Government," citing 34 C.F.R. § 75.253(a)(5). AR 001058–1066. The Non-Continuation Decisions further stated:

> The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: **violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.** The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

AR 001058, 1061, 1064 (emphasis added). The Non-Continuation Decisions stated that the Department had identified in each State's application "information indicating that the applicant

[4] Although the notices were emailed on September 5, 2025, they were dated August 27, 2025. Heenan Decl. ¶ 19; Foehr Decl. ¶ 19; Van Haren Decl. ¶ 22.

has proposed project activities that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education," thus reproducing the boilerplate language contained in the June Directive. *Id.*

Each Non-Continuation Decision then referenced a few sentences containing equity-related language in each of Plaintiff State's underlying applications. *Id.* This equity-related language had been included to comply with EDGAR Selection Criteria (c) (California); the GEPA Equity Directive (Rhode Island); and EDGAR Selection Criteria (d) (Wisconsin). Heenan Decl. ¶¶ 20-21; Foehr Decl. ¶¶ 20-21; Van Haren Decl. ¶¶ 23-24. The Non-Continuation Decisions concluded, "As a result of the information identified . . . the program office has determined that continuation of the project would be in conflict with agency policy and priorities, and so is not in the best interest of the Federal Government." AR 001058, 001061-62, 001064.[5]

## III. The Prior, Ongoing, and Imminent Harm Caused by The June Directive

Plaintiff States experienced significant harm as a result of the 2025 SPDG grant discontinuations, including program closure and staff layoffs. Heenan Decl. ¶ 24; Van Haren Decl. ¶¶ 27-30; Foehr Decl. ¶ 24. In California, for example, the lost funding "reduced resources that connect families with schools through family engagement initiatives that empowered parents to advocate for and support their children's education." Heenan Decl. ¶ 24. These impacts were more severe in under-resourced school districts, and have caused long term harm to California's education system. *Id.*

The June Directive has also caused (and will continue to cause) substantial harm to Plaintiff States beyond the impact of the discontinued SPDG grants. For example, Plaintiff States

[5] The Non-Continuation Decisions stated that Plaintiff States could request reconsideration within seven calendar days. AR 001059, 1062, 1065. *See* 34 C.F.R.§ 75.253(g). Rhode Island's RIDE submitted a request for reconsideration on September 12, 2025, which was denied on September 23, 2025. AR 001147–1150, 001153–1154. California's CDE submitted a request for reconsideration on September 12, 2025, which was denied on September 23, 2025. AR 001079–1146, 001151–1152. Wisconsin's DPI submitted a request for reconsideration on September 11, 2025, which was denied on September 29, 2025. AR 001075–1078, 001155–1156. The Department's denials did not address any of Plaintiff States' arguments or evidence, and instead simply restated the grounds for the original discontinuation, again tracking the language of the June Directive. AR 001151–1156.

maintain numerous other multi-year grants—many of which were awarded by the prior Administration and which included required GEPA Equity statements—all of which are subject to the June Directive's unlawful review and discontinuation process. Heenan Decl. ¶¶ 28-32; Van Haren Decl. ¶¶ 35-39; Foehr Decl. ¶¶ 28-35. These grants, which amount to hundreds of millions of dollars collectively, include but are not limited to: a $99,777,778.00 award to increase the number of high-quality charter schools; a $10,000,000 award to improve outcomes for disabled youth with criminal history; and a $40,000,000 award to advance literacy skills through evidence-based practices. Heenan Decl. ¶ 30; Van Haren Decl. ¶ 36; Foehr Decl. ¶¶ 30-31. Plaintiff States were also recently awarded new, multi-year SPDG awards in 2026, which fund SPDG programs that differ from those that were discontinued in 2025. Heenan Decl. ¶ 26; Van Haren Decl. ¶¶ 31-33; Foehr Decl. ¶¶ 25-27.

Plaintiff States have also incurred considerable costs due to uncertainty in the administration of multi-year grants, including contingency planning if funding is discontinued again, how to comply with shifting agency priorities and interpretations of civil rights laws—which are subject to change at any time during the multi-year grant period—and frequent consultation with local partners about the reliability of funding and the Department's interpretation of the scope of permissible activities. Heenan Decl. ¶¶ 34-35; Van Haren Decl. ¶¶ 41-42; Foehr Decl. ¶ 38-39.

Plaintiff States are collectively concerned about the reliability of these significant funding streams based on the Department's past unlawful, arbitrary and capricious discontinuations; its unlawful mid-cycle alteration of priorities; and its misapplication of IDEA and Department regulations, including the "best interest" provision in 34 C.F.R. § 75.253(a)(5). Heenan Decl. ¶ 36; Van Haren Decl. ¶ 43; Foehr Decl. ¶ 40.

## LEGAL STANDARD

"[S]ummary judgment is appropriate" in APA cases. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). The Court's role "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Materials not

compiled by Defendants may be treated as part of the Administrative Record where they were "directly or indirectly considered by agency decision-makers." *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 683–84 (N.D. Cal. 2020) (quoting *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989)) (considering agency documents submitted by the plaintiffs).

Under the APA, the Court must "hold unlawful and set aside agency action" that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A)–(D). As to Plaintiff States' constitutional claim, this Court has the "equitable power[]" to "enjoin unconstitutional actions by state and federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015), and summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

## ARGUMENT

### I. PLAINTIFF STATES HAVE STANDING

To support standing, a plaintiff must "present an injury that is [1] concrete, particularized, and actual or imminent; [2] fairly traceable to the defendant's challenged behavior; and [3] likely to be redressed by a favorable ruling." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019) (citation modified). At summary judgment, plaintiffs "must set forth by affidavit or other evidence specific facts" to support standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation modified). Here, Plaintiff States have established several injuries in fact, all caused by the June Directive, and all redressable by this Court.

Plaintiff States face a "substantial risk" that their multi-year grants, including the 2026 SPDG grant, will be unlawfully discontinued. *Dep't of Com.*, 588 U.S. at 767 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). As long as the June Directive remains operative, Plaintiff States face the threat that the Department will discontinue their grants based on (1) an erroneous interpretation of 34 C.F.R. § 75.253; (2) the anti-DEI priorities in the June Directive, which have not been subject to notice-and-comment rulemaking; and/or (3) other new

policy preferences implemented without formal rulemaking. Indeed, the persistent threat of a sudden, unliteral discontinuation based on DEI or other new priorities of the Administration has already caused substantial uncertainty and administrative burden within Plaintiff States' educational agencies. Heenan Decl. ¶¶ 34-35; Van Haren Decl. ¶¶ 41-43; Foehr Decl. ¶ 38-40;[6] *New Jersey v. U.S. Off. of Mgmt. & Budget*, 837 F. Supp. 3d 258, 270 (D. Mass. July 17, 2026) (holding that Plaintiffs had established "injury-in-fact with respect to currently active grants" where it was "possible to conclude that some grants [were] substantially likely to be terminated"). In a recent action challenging the February Directive, the court held that plaintiffs had established standing where they had a "demonstrated history of applying for grants, had previously suffered termination under the February 2025 Directive, and had concrete plans to seek additional funding with applications containing similar proposals." *California v. U.S. Dep't of Educ.*, 2026 WL 2754968, at *12. Plaintiff States here have established even more concrete harm, given the hundreds of millions in active grants that are vulnerable to unlawful discontinuation. *See supra* Factual Background, Sections II, III.

Indeed, Plaintiff States already have experienced actual harm,[7] as Defendants implemented the June Directive to eliminate SPDG programs in Plaintiff States, which led to the closure of education programs, the cessations of services to students, and related harms. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92, 100 (1st Cir. 2025) (explaining that plaintiffs "provided detailed evidence" of harm, such as "staff layoffs, program disruptions, and the halting of stipends to currently enrolled teachers"); *Dep't of Educ. v. California*, 604 U.S. 650, 652 (2025) (per curiam) (accepting that Plaintiffs are harmed by "any wrongfully withheld funds"). That harm was directly caused by the Directive, whose review procedures resulted in the discontinuation of Plaintiff States' SPDG grants. AR 001055–1057 (June Directive).

Plaintiff States also have standing to challenge the Directive as it violates Plaintiff States' procedural rights, including to notice-and-comment rulemaking required by GEPA, before

[6] "[E]xtra-record evidence may be considered to assess standing and to determine whether injunctive relief is appropriate." *Yurok Tribe v. U.S. Bureau of Reclamation*, 231 F. Supp. 3d 450, 455 (N.D. Cal. Feb. 8, 2017).

[7] Heenan Decl. ¶ 24; Van Haren Decl. ¶¶ 27-30; Foehr Decl. ¶ 24.

changing the priorities or conditions for grantmaking. *See infra* Argument, Section II(B)(1). Plaintiff States maintain a "concrete interest that is affected by the deprivation" of such procedural rights, which is ongoing and affects current and future grant awards. *Dep't of Educ. v. Brown*, 600 U.S. 551, 562 (2023) (citation modified).

These actual and ongoing injuries can be redressed by the Court: vacating, declaring unlawful, and enjoining the Department from implementing the June Directive or equivalent discontinuation procedures will ensure that Plaintiff States' multi-year grants will not be subject to unlawful, arbitrary and capricious discontinuation and will reduce, if not eliminate, the administrative costs and burdens caused by the June Directive.

## II. The June Directive Violates the APA

### A. The Directive is Final Agency Action.

The June Directive is final agency action that Plaintiff States can challenge under the APA's "generous review provisions." *See Bennett v. Spear*, 520 U.S. 154, 163 (1997) (citation modified). Agency action is final if it: (1) "mark[s] the consummation" of agency decision-making, and (2) determines "rights or obligations . . . from which legal consequences will flow." *Id.* at 177–78 (citation modified). Courts consider "factors such as whether the action amounts to a definitive statement of the agency's position, whether it has a direct and immediate effect on the day-to-day operations of the subject party, and if immediate compliance . . . is expected." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*, 128 F.4th 1089, 1108 (9th Cir. 2025) (quotation omitted). Finality is "interpreted in a pragmatic and flexible manner[,]" "focus[ing] on the practical and legal effects of the agency action." *Saliba v. SEC*, 47 F.4th 961, 967 (9th Cir. 2022) (quotation omitted).

The June Directive easily clears this hurdle. It instructs Department personnel to evaluate and discontinue grants based on new Administration priorities, and is thus reviewable agency action. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) ("Plaintiffs frequently seek vacatur of internal agency guidance on arbitrary-and-capricious grounds in district court or directly in the D.C. Circuit.") (citing cases). The Directive sets out new procedures that Department personnel must follow, so it consummates the agency's

decision making. *See* AR 001055–1057. And legal consequences flow from the Directive, namely that grantees like Plaintiff States are subject to discontinuation for failure to align their grant projects with new Administration priorities that are imposed post-acceptance and were not subject to notice-and-comment rulemaking. *See Rhode Island v. Trump*, 810 F. Supp. 3d 283, 302 (D.R.I. 2025) (citation modified) (loss of grant funds was a "legal consequence[]" of agency "policy to eliminate all non-statutorily required activities and functions"); *Texas v. Cardona*, 743 F. Supp. 3d 824, 838, 841–47 (N.D. Tex. 2024) (guidance documents impacting "Texas educational entities that accept federal dollars" were final agency action).

The final nature of the June Directive is reinforced by the 2025 discontinuations, which themselves are also final agency action. *See Washington II*, 167 F.4th at 1245 (finding that February Directive "had binding legal effect upon grant programs" as it "mandated an across-the-board review of all new grant awards and the re-review of all issued grants in accordance with the Department's new policy objectives, resulting in the discontinuation of grants in Plaintiff States"). The swift action taken by the Department to implement the June Directive confirms that it is binding on Department personnel. *See Biden v. Texas*, 597 U.S. 785, 808–09 (2022); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (noting that "an agency pronouncement will be considered binding" "if it either appears on its face to be binding," or "is applied by the agency in a way that indicates it is binding").

Because the June Directive marks the consummation of Defendants' decision-making and determines the rights of Plaintiff States, it is final agency action under the APA.

### B. The June Directive is Contrary to Law and Without Observance of Procedure Required by Law.

The June Directive is contrary to law because it: (1) violates GEPA's rulemaking requirement; (2) violates the Department's own continuation regulations; and (3) is contrary to IDEA's and GEPA's equity requirements. Further, in violating GEPA's rulemaking requirement, the Directive did not observe procedures required by law. 5 U.S.C. § 706(2)(D).

**1. The June Directive violates GEPA's rulemaking requirement. (Counts I and II)**

Under GEPA, the Department must undertake notice-and-comment rulemaking for "[1] any generally applicable rule, regulation, guideline, interpretation, or other requirement that [2] is prescribed by the Secretary or the Department; and [3] has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program." *Washington II*, 167 F.4th at 1245 (quoting 20 U.S.C. § 1232(a)); *see also* 20 U.S.C. § 1221e-4.[8]

Several courts have already held that the February Directive violates GEPA's rulemaking requirement, and the same reasoning applies to the June Directive. *See Washington II*, 167 F.4th at 1245 (February Directive "seem[s] to implicate GEPA's rulemaking requirement"); *Washington I*, 813 F. Supp. 3d at 1240–45 (holding that application of February Directive's unpublished criteria to existing grants violated GEPA's rulemaking requirements); *California v. U.S. Dep't of Educ.*, 2026 WL 2754968, at *28–30 (same). Like the February Directive, the June Directive is "prescribed by" the Department and announces a "generally applicable rule" to review "all grant awards to advance the Administration's priorities." AR 001055; *see* 20 U.S.C. § 1232(a).

Further, the June Directive has a "legally binding effect" because it targets for discontinuation all discretionary awards that do not advance the Administration's new priorities. *Washington II*, 167 F.4th at 1245 ("The directive mandated an across-the-board review of all new grant awards and the re-review of all issued grants in accordance with the Department's new policy objectives, resulting in the discontinuation of grants in Plaintiff States."). And as the District of Massachusetts recently held with respect to the February Directive, even if it does not, "itself, terminate a grant, and instead merely instructs agency personnel to review existing grants," "[i]t mandates an 'across-the-board' review pursuant to a sweeping new policy that applies *en masse* to an entire category of grants." *California v. U.S. Dep't of Educ.*, 2026 WL 2754968, at *29 (quoting *Washington II*, 167 F.4th at 1245). Significantly, the June Directive

[8] Although the APA generally exempts grants from the rulemaking process, 5 U.S.C. § 553(a)(2), GEPA removes that exemption for the Department, with exceptions that do not apply here. 20 U.S.C. § 1232.

resulted in the discontinuation of Plaintiff States' SPDG grants based on new priorities, thus confirming the Directive's legally binding effect.[9] *See Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 855 (D. Md. 2025) ("Under GEPA, 'department priorities' are established by the Secretary or Department and grant recipients must abide [by] them to avoid award cancellation—which is to say, they are legally binding on the federal award recipient. As a matter of law, therefore, such 'priorities' . . . must go through public notice and comment rule making.").

Finally, GEPA's rulemaking requirement also applies because the June Directive implicitly repealed the Department's prior priorities that encouraged equity programs. "The APA generally requires notice-and-comment procedures whenever an agency creates, amends, or repeals a rule." *NAACP v. Trump*, 298 F. Supp. 3d 209, 236 (D.D.C. 2018), *aff'd and remanded sub nom. DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020). Like the February Directive, the June Directive "announces that DEI programs are inherently discriminatory and in violation of federal civil rights law. That policy directly contravenes, and thus implicitly repeals, the Department's prior . . . priorities, which promoted and encouraged such programs." *California v. U.S. Dep't of Educ.*, 2026 WL 2754968, at *30; *see also Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*, 41 F.4th 564, 568 (D.C. Cir. 2022) (quotation omitted) ("Providing for notice and comment before repeal of a final rule ensures that an agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal.").

Judicial review of an agency's procedural compliance is "exacting." *See Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006). "[I]f a statute requires rulemaking, the

[9] Even if the Department had engaged in rulemaking for the new priorities announced through the June Directive, the Department still could not rely on them to discontinue pending multi-year awards because it may not rely on priorities arising after an application and award. The Department can only set priorities for grant programs when it is eliciting applications for grants. "Each fiscal year, the Secretary publishes application notices . . . for *new* grants" and the notices include "priorities established by the Secretary for the program for that year." 34 C.F.R. §§ 75.100(a), 75.101(a)(4) (emphasis added). Continuation awards, however, do not go through an application process, *see id.* §§ 75.118, 75.253(a), and as such, continuation decisions cannot be based on new priorities that grantees knew nothing about when they applied for grants and operated their programs. Through the June Directive and its implementation, the Department unlawfully seeks to "r[u]n a new grant contest evaluating existing original grant applications against new unpublished priorities." *Washington I*, 813 F. Supp. 3d at 1245.

affected agency must comply." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 565 (2025). Accordingly, the June Directive is contrary to law and not in observance of the APA's procedural requirements because it was not subject to formal rulemaking, as required by GEPA.

**2. The June Directive violates the Department's continuation regulations. (Count I)**

"[A]gencies may not violate their own rules and regulations to the prejudice of others." *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005). The June Directive violates the Department's regulations governing continuations, 34 C.F.R. § 75.253(a)(5), by requiring consideration of new priorities rather than performance.

To receive a continuation award, a grantee must meet the requirements of 34 C.F.R. § 75.253(a), including a "a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." 34 C.F.R. § 75.253(a)(5). Section 75.253(b), in turn, explains what the Department may consider when determining whether a grantee has met the continuation requirements, including the "best interest" determination:

> Information considered in making a continuation award. In determining whether the grantee has met the requirements described in paragraph (a) of this section, the Secretary may consider ***any relevant information regarding grantee performance***. This includes considering reports required by § 75.118, performance measures established under § 75.110, financial information required by 2 CFR part 200, and any other relevant information.

*Id.* § 75.253(b) (emphasis added). The second sentence of § 75.253(b) provides examples of "any relevant information regarding grantee performance," including performance reports and financial information.

In the June Directive, the Department interprets these provisions to permit it to disregard performance and instead to solely consider new, unpublished policy priorities. The June Directive also requires consideration of the initial, approved grant application materials—including the required GEPA Equity Statement—to discontinue grants. AR 001056. Indeed, the Department's 2025 discontinuation notices state that Plaintiff States' grants were discontinued due to statements

in their applications reflecting a conflict with the priorities of the "current Administration," and thus were "not in the best interest of the Federal Government." AR 001058–1066.

The Department's overbroad interpretation of "best interest" is unlawful and "unreasonable, considering the regulatory text, history, and purpose, as well as the applicable statutory requirements governing Department grant programs." *Washington I*, 813 F. Supp. 3d at 1244. As the *Washington I* court held, interpreting "any other relevant information" to include more than "items akin to those specifically enumerated"—*i.e.*, "the required performance, fiscal, and management reports"—would "render[] meaningless the specific text that accompanies it." *Id.* at 1243 (quoting *Fischer v. United States*, 603 U.S. 480, 487 (2024)). Moreover, a "vague, undefined 'best interest'" standard, which can change at the whim of an Administration's shifting priorities, "would frustrate the regulations and agency guidance that uniformly encourages grantees to tailor their grant applications to address *published* priorities and, if the application is approved, to make progress toward the program goals and objectives identified in the application." *Id.* Accordingly, the June Directive is contrary to the Department's continuation regulations.[10]

### 3. The June Directive conflicts with the equity directives of IDEA and GEPA. (Count I)

The June Directive precludes funding for anything related to diversity, equity, or inclusion, and thus conflicts with core provisions of IDEA and GEPA that require the advancement of racial equity.

In passing IDEA, Congress stressed the importance of promoting equity and of guarding against racial disproportionality. IDEA states that "recruitment efforts for special education

[10] The June Directive is also contrary to law because the Secretary must "give[] priority to continuation awards over new grants." *See* 34 C.F.R. § 75.253(c). Instead of doing so, the Department, pursuant to the Directive, discontinued grants that conflicted with the current Administration's priorities. In fact, a Department spokesperson admitted that the discontinued grant funds were "being re-invested immediately into high-quality programs that better serve special needs students," *i.e.*, new applications for grants that did not include phrases like "diversity, equity, and inclusion." Basbaum Decl., Ex. C at 2 (*Most—But Not All—Imperiled Federal Grants for Special Education Will Continue*). In doing so, the Department "violated the regulatory priority given to continuing multi-year grants rather than funding new grants." *Washington I*, 813 F. Supp. 3d. at 1245 (citing 34 C.F.R. § 75.253(c)).

personnel should focus on increasing the participation of minorities in the teaching profession" and that "full participation by minority individuals, minority organizations, and Historically Black Colleges and Universities . . . is essential to obtain greater success in the education of minority children with disabilities." 20 U.S.C. §§ 1400(c)(10), (13). Congress also directed the Department to address the disproportionate rate of racial and ethnic groups in special education. *See* 20 U.S.C. §§ 1400(c)(10)–(13). Likewise, GEPA requires applicants for funding to explain how projects will "ensure equitable access to, and equitable participation in" proposed projects or activities. 20 U.S.C. § 1228a(b) (requiring applicants to consider "barriers based on gender, race, color, national origin, disability, and age"). Because applicable law "bakes into its core principles of diversity, equity, [and] inclusion," *San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 750 (N.D. Cal. 2025), it is difficult "to conceive of any grant" issued under IDEA, and consistent with GEPA, that would not need to address equity. *California v. U.S. Dep't of Educ.*, 2026 WL 2754968, at *26 (quotation omitted).

The June Directive conflicts with these equity requirements and, along with the February Directive, has been applied to discontinue and terminate countless grants throughout the country, including Plaintiff States' SPDG awards, due to equity-related programming.[11] These actions have all been pursuant to the Administration's broader campaign against whatever it perceives to be "DEI." *See supra* Factual Background, Section I(A). And although the June Directive purports to center on anti-discrimination law, its implementation has unequivocally centered on anti-DEI policy rather than purported legal violations. AR 001058, 001061, 001064 (non-continuation notices citing equity-related language included in Plaintiff States' grant applications).[12] Indeed, the Department's webpage devoted to its "Grant Discontinuation and Termination Processes" states: "The Department has undertaken a review of all funding and has found grants that reflect

[11] *See, e.g.*, *Washington I*, 813 F. Supp. 3d at 1245–46; *Council for Opportunity in Educ.*, 2026 WL 120984, at *9–17; *Bd. of Educ. of City Sch. Dist. of City of New York v. U.S. Dep't of Educ.*, 2026 WL 948205, at *1–2; *California v. v. U.S. Dep't of Educ.*, 2026 WL 2754968, at *28.

[12] If the Department's non-continuations were based on alleged violations of antidiscrimination laws, it would have been required to provide numerous procedural protections to grantees. *See* 20 U.S.C. § 1682; 42 U.S.C. § 2000d-1; 34 C.F.R. §§ 100.8–11; 20 U.S.C. §§ 1234d, 1234i; 34 C.F.R. §§ 81.1–.45; *Washington v. U.S. Dep't of Educ.*, No. C26-2409-KKE, 2026 WL 2836972, at *5 (W.D. Wash. Sept. 22, 2026) (holding that Plaintiffs were entitled to procedural protections before terminating a grant based on civil rights violations).

the prior Administration's priorities and policy preferences and conflict with those of the current Administration." Basbaum Decl., Ex. D at 2 (*Department Grant Discontinuation and Termination Process*). The Department has thus conceded that its review process, including the June Directive, is about "priorities and policy preferences." The Department's own spokesperson has also admitted as much, explaining that that the SPDG discontinuations were made simply for using phrases like "diversity, equity, and inclusion" or "systemic racism." Basbaum Decl., Ex. C at 2.

The June Directive's targeting of equity-related programming is contrary to both IDEA and GEPA, and thus is contrary to law under the APA. "Agencies may not choose to reject, terminate, or otherwise penalize grant applications based on the very criteria Congress expressly requires the agency to promote." *California v. U.S. Dep't of Educ.*, 2026 WL 2754968, at *28.

### C. The June Directive and its Implementation are Arbitrary and Capricious (Count III).

An agency's action is arbitrary and capricious when it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When changing positions, an agency must also consider the "serious reliance interests" engendered by the status quo. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotation omitted). An agency must both "display awareness that it *is* changing position" and "show that there are good reasons" for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Wages & White Lion Invs., L.L.C.*, 604 U.S. at 567 ("change-in-position doctrine" prevents agencies from "mislead[ing] regulated entities").

Here, the June Directive is arbitrary and capricious because it: (1) changes longstanding Department policy without acknowledgement or justification; and (2) disregards extensive reliance interests.

**1. The Department changed positions without justification.**

The June Directive is arbitrary and capricious because the Department did not acknowledge, much less provide sufficient reasons for, its change in position. The Department changed positions in two ways.

First, the Department has historically (and routinely) granted continuations based on grantee performance rather than on compliance with new mid-stream policy priorities. As early as 2010, the Department stated: "To receive funds after the initial year of a multiyear award, grantees must submit a continuation performance report that describes the progress the project has made toward meeting the *predefined* benchmarks and milestones established at the *beginning of the project*.") (emphasis added). Basbaum Decl., Ex. E at 31 (*Grantmaking at ED*). In its 2023 *Handbook for the Discretionary Grant Process*, the Department explains that, to be eligible for a continuation award, a grantee must make "substantial progress in achieving the goals and objectives of its grant and in meeting its performance measures and targets *within the scope of its approved grant application*." Basbaum Decl., Ex. H at 293 (emphasis added); *see also id.* at 285 (requiring that program offices "determine[] that continuing funding is in the best interest of the Federal government (e.g., the program staff believes the project continues to serve *the priorities of the program*)") (emphasis added). The Department re-affirmed this policy in 2024. Basbaum Decl., Ex. A at 31–32 (describing items considered for continuation of award).

The Department's regulations also state its "intention to make continuation awards to fund the remainder of the project period" upon approval of Plaintiff States' multi-year grants, 34 C.F.R. § 75.251(b)(2), and confirm that it prioritizes "continuation awards over new grants," 34 C.F.R. § 75.253(c).[13] Plaintiff States' collective experience, spanning decades of receiving and administering Department grants, has been consistent with these pronouncements. Heenan Decl. ¶¶ 5-7; Van Haren Decl. ¶¶ 7–10; Foehr Decl. ¶¶ 7-8.

[13] *See also, e.g.*, Direct Grant Programs, 59 Fed. Reg. at 30259 (explaining that a cut-off in continuation award funding is "extremely rare in practice"); EDGAR and Related Regulatory Provisions, 89 Fed. Reg. at 70316 (explaining that, "[i]n general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance").

The June Directive altered this longstanding practice, and now requires Department staff to discontinue awards based on new, previously unannounced "priorities." Indeed, the 2024 guidance discussed above—which confirmed that continuations would be based on performance—has apparently been removed from the Department's website. Basbaum Decl. ¶ 2 & Ex. A. The Directive and its implementation now make clear that the Department will make continuation decisions not by assessing a grantee's performance of the original, published priorities (as it had historically done), but based on any statements in the underlying application that mentioned equity-related programming, including the required GEPA Equity Statement. AR 001058, 001061, 001064. And rather than continuing its practice of routinely granting continuation awards, the Department has discontinued grants *en masse* pursuant to both the February and June Directives. *See supra* Factual Background, Sections I(A), II(C). The failure to justify, let alone acknowledge, this change in position was arbitrary and capricious. *See Washington I*, 813 F. Supp. 3d at 1237–38 (quotation omitted) (finding "ample evidence that the [February] Directive resulted in a change in the procedure for receiving continuation awards," and that it failed to provide even the "minimal level of analysis" needed to support such a change).

Second, in the June Directive, the Department changed how it considers equity-related initiatives. For example, in 2020, the Department stated that it would consider "the extent to which the applicant encourages applications for employment from persons who are members of groups that have traditionally been underrepresented based on race, color, national origin, gender, age, or disability." AR 000022 (Applications for New Awards; State Personnel Development Grants, 85 Fed. Reg. at 85623). In 2022, the Department required applicants to "[d]escribe[] the steps the SEA will take to ensure that economically disadvantaged and minority children are not taught at higher rates by teachers who do not meet the qualifications." AR 000334 (Applications for New Awards; SPDGs, 87 Fed. Reg. at 35526). And in 2024, the Department stated that applicants "must" "[e]nsure equal access and treatment for members of groups that have traditionally been underrepresented based on race, color, national origin, gender, age, or disability." AR 000633 (SPDGs, 89 Fed. Reg. 56211, 56214 (July 9, 2024)). These positions

were consistent with the statutory mandates of the GEPA Equity Directive and IDEA, the Department's own regulations, and the Department's public statements.[14] *See supra* Factual Background, Section II(A); Argument, Section II(B)(3).[15]

As discussed above, the June Directive abruptly altered this longstanding commitment to equity. *See supra* Factual Background, Section II(A); Argument, Section II(B)(3). The Directive, its implementation, and the Administration's broader campaign against DEI are all stark departures from the Department's prior support for equity initiatives. Rather than explain its change in policy, the June Directive "simply announces a new policy without engaging with the factual record or reasoning that supported the Department's prior approach." *California v. U.S. Dep't of Educ.*, 2026 WL 2754968, at *21. Such "unexplained inconsistency in agency policy is a reason for holding an [action] to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (citation modified); *see also California v. U.S. Dep't of Educ.*, 2026 WL 2754968, at *20 (holding that the February Directive "marks a substantial shift from the Department's past approach, under which it actively promoted DEI programs in . . . grant applications (and, relatedly, implicitly articulated a position that DEI programs are lawful under federal civil rights laws)").

### 2. The Department changed positions without considering extensive reliance interests.

In changing its longstanding positions, the Department also failed to consider the impact on reliance interests. Where an agency is "not writing on a blank slate," it must "assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33; *see also Fox Television Stations*, 556 U.S. at 515 (where "prior policy has engendered serious reliance interests," agency must provide "a more detailed justification" for new policy).

[14] *See* Basbaum Decl., Exs. F (*Trump Cracks Down on Diversity Initiatives Celebrated in His First Term*), G (*Questions and Answers Regarding the Supreme Court's Decision in* Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina).

[15] *See* 34 C.F.R. §§ 75.210(e)(2), (g)(2)(V); *see also* AR 000015–24 (Applications for New Awards; SPDGs, 85 Fed. Reg. at 85623); AR 000333–343 (Applications for New Awards; SPDGs, 87 Fed. Reg. at 35531–32); AR 000636–647 (Applications for New Awards; SPDGs, 89 Fed. Reg. at 56362, 56365 ).

Here, Plaintiff States have relied on the Department's longstanding continuation procedures to craft budgets, make long-term financial plans, coordinate with pass-through entities, and establish relevant policies and practices. Heenan Decl. ¶ 8; Van Haren Decl. ¶ 10; Foehr Decl. ¶ 8. Plaintiff States have likewise complied with the Department's regulatory and statutory obligations to promote equity and proportionality in Department programs. *See* Heenan Decl. ¶ 21; Van Haren Decl. ¶ 24; Foehr Decl. ¶ 21. And Plaintiff States have also relied on the Department's consistent and routine practice of granting, rather than denying, yearly continuations based on performance. Heenan Decl. ¶¶ 23-24; Van Haren Decl. ¶ 26; Foehr Decl. ¶¶ 23-24; *see also* Direct Grant Programs, 59 Fed. Reg. at 30259 (discontinuations are "extremely rare in practice"). Many of the local education agencies that partner with Plaintiff States have likewise relied on these core features of the Department's funding framework. Heenan Decl. ¶¶ 8, 24; Van Haren Decl. ¶ 10, 41; Foehr Decl. ¶ 8. But the record lacks any consideration of the June Directive's impact on Plaintiff States or their programs that are funded by the Department. This failure to consider reliance on longstanding procedures and priorities is arbitrary and capricious.

## III. THE JUNE DIRECTIVE VIOLATES THE SPENDING CLAUSE (COUNT IV)

The Spending Clause vests the spending power in Congress alone. U.S. Const. art. I, § 8, cl. 1. Incident to that power, "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). In fact, as the Supreme Court set forth, "Congress enacted the IDEA pursuant to the Spending Clause." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295 (2006). However, the Clause limits how Congress and federal agencies—which distribute funding under the authority delegated to them by Congress—may adopt or enforce spending conditions. *Id.*; *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 566 n.70 (S.D.N.Y. 2019).

Conditions placed on federal funds must be imposed "unambiguously," so that States, in deciding whether to accept such funding, can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Spending Clause ambiguity is viewed "from the perspective of a state official who is engaged in the process of deciding whether the State should

accept [the funds] and the obligations that go with those funds." *Arlington*, 548 U.S. at 296. The "clear notice" requirement also means that notice of the condition must be provided before acceptance, forbidding retroactive conditions. *City of Los Angeles v. Barr*, 929 F.3d 1163, 1174–75 (9th Cir. 2019). Finally, the Spending Clause prohibits imposing conditions "unrelated to the federal interest in particular national projects or programs" funded under the legislation. *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 128 (1st Cir. 2003) (quoting *Dole*, 483 U.S. at 207–08).

Here, the June Directive violates the Spending Clause in three ways.

First, the Directive's requirement that the Department base discontinuation decisions on new, unpublished, priorities, which could change at any moment and be set forth only in an internal memorandum, inserts an ambiguity into the continuation process that the Constitution cannot tolerate. *See San Francisco Unified Sch. Dist.*, 789 F. Supp. 3d at 745–750 (plaintiffs likely to succeed on Spending Clause claim where new anti-equity conditions were impermissibly vague).

Second, the Directive imposes new conditions retroactively, well after Plaintiff States had applied for, been awarded, and accepted federal funding. Congress's spending powers "do[] not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012). Once a State has accepted federal funds, the federal government may not change the conditions such that it "accomplishes a shift in kind, not merely degree." *Sebelius*, 567 U.S. at 583. And because the Department, through the June Directive, now claims authority to discontinue grants based on "new priorities" pursuant to 34 C.F.R. § 75.253(a), its reinterpretation of that regulation is also a retroactive condition on multi-year funding. *See New York v. U.S. Dep't of Just.*, 804 F. Supp. 3d 294, 328 (D.R.I. Sept. 10, 2025) (plaintiffs likely to prevail on claim that agency violated Spending Clause by "abruptly revoking . . . exemptions" because "when the States accepted funding, the governing agencies had publicly adopted interpretations exempting many programs" under statute at issue).

Third, the June Directive's imposition of anti-DEI principles is not reasonably related to the federal interests animating IDEA, which authorizes the SPDG program and recognizes the

importance of increasing the number of minority educators. 20 U.S.C. §§ 1400(c)(10)–(13). As in other cases where courts have found unrelated conditions on federal spending unconstitutional, this Court likewise should find that the anti-DEI principles imposed on grant programs that are intended to *support* educator diversity bear no relationship to the purpose of the spending. *See, e.g.*, *San Francisco Unified Sch. Dist.*, 789 F. Supp. 3d at 750–51 (finding plaintiffs were likely to succeed on their claims that anti-equity directive and grant conditions violated the Spending Clause because "they lack an adequate nexus to the purposes of AmeriCorps' funding program"); *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 959 (N.D. Cal. 2018), *aff'd in part, vacated in part sub nom. City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020) ("The Byrne JAG programs that are at risk of losing funding because of the access and notice conditions do not relate to immigration enforcement.").

## IV. Plaintiff States are Entitled to Vacatur, Declaratory Relief, and Injunctive Relief

### A. Plaintiff States Are Entitled to Vacatur of the June 2025 Directive.

Courts "shall . . . hold unlawful and set aside agency action" when such an action is arbitrary and capricious, contrary to law, or otherwise violates the APA. 5 U.S.C. § 706(2). Vacatur is the "default remedy under the APA." *Montana Wildlife Fed. v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 830 (2024) (Kavanaugh, J., concurring); *see also Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2662 n.1 (2025) (Barrett, J., concurring) ("If a district court decides that agency guidance violates the APA, it may vacate the guidance, preventing the agency from using it going forward.").

As discussed above, the June Directive violates the APA, and thus the "default remedy" of vacatur is appropriate. Vacatur is especially warranted in light of the many ways in which the Directive is unlawful, and the impact it has and will have on Plaintiff States, their schools, and their students. *See* Heenan Decl. ¶¶ 24, 33-36; Van Haren Decl. ¶¶ 27-30, 40-43; Foehr Decl. ¶¶ 8, 24, 27, 36-40. Moreover, the Department has indicated that it will rely on and implement the

June Directive for the foreseeable future. *See* Decl. of Murray Bessette ¶¶ 5, 6, *California v. U.S. Dep't of Educ.*, 2026 WL 2754968 (stating that the June Directive superseded the February Directive); Additional Decl. of Murray Bessette ¶¶ 2, 4, 5, *California v. U.S. Dep't of Educ.*, 2026 WL 2754968 (stating the same, and adding that all program offices involved in grant-making received training on implementation of the June Directive). In *Washington I*, the court vacated a similar directive that led to the unlawful discontinuation of grants after finding "serious, fundamental errors in the Department's Directive procedure that led to unlawful discontinuation of the Grants at issue" and "that those actions caused significant disruption to Plaintiff States." 813 F. Supp. 3d at 1248. This court should similarly vacate the June Directive.

**B. Plaintiff States Are Entitled to Declaratory Relief.**

The APA and Declaratory Judgment Act both authorize district courts to provide declaratory relief. 5 U.S.C. §§ 702, 703; 28 U.S.C. § 2201(a). Declaratory relief is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1470 (9th Cir. 1984).

Declaratory relief is appropriate here. An order declaring the procedures underlying the June Directive unlawful would settle the legal questions at issue and end the controversy giving rise to this lawsuit. Further, Plaintiff States hold numerous discretionary multi-year grants, including SPDG grants, that are subject to the June Directive, and declaratory relief would provide certainty that these grants will not be subject to unlawful discontinuation. Declaratory relief would also have "significant educational and lasting importance," beyond the parties in this matter, for other grant applicants that apply for multi-year grants. *Bilbrey*, 738 F.2d at 1471.

**C. Plaintiff States Are Entitled to Injunctive Relief.**

Injunctive relief is appropriate when plaintiffs show: "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved

by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiff States meet each of these factors.

### 1. Plaintiff States Have Suffered and Will Continue to Suffer Irreparable Harm.

The Department's June Directive has caused irreparable harm to Plaintiff States and their educational systems.

As a result of the Department's implementation of the June Directive in 2025, Plaintiff States' SPDG grants were discontinued and Plaintiff States were forced to lay off educators and reduce services available to children in Plaintiff States. Heenan Decl. ¶ 24; Van Haren Decl. ¶¶ 22, 27-30; Foehr Decl. ¶¶ 17, 24. The Department's actions further harmed grantees' missions and reputations and negatively impacted thousands of children with disabilities. Heenan Decl. ¶ 24; Van Haren Decl. ¶¶ 27-30; Foehr Decl. ¶ 24; *see, e.g.*, *Michigan v. DeVos*, 481 F. Supp. 3d 984, 996 (N.D. Cal. 2020) (citing *Certain Named & Unnamed Non-Citizen Child. & Their Parents v. Texas*, 448 U.S. 1327, 1332-33 (1980) (hampering students' participation in school is irreparable harm)).

Plaintiff States also invested substantial time and resources in reliance on a lawful continuation process for Department grants. Grantees had "designed their budgets, programming, staffing, and partnerships with community organizations based on the understanding that [the Department] would fulfill its obligations" to conduct itself lawfully. *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health and Hum. Servs.*, 328 F. Supp. 3d 1133, 1150 (E.D. Wash. 2018); Heenan Decl. ¶¶ 8, 17; Van Haren Decl. ¶ 10; Foehr Decl. ¶¶ 7-8. The June Directive and its implementation have disrupted grantees' ability to continue "operations as planned" and threaten the goodwill and relationships with local community partners. *Planned Parenthood of Greater Wash. & N. Idaho*, 328 F. Supp. 3d at 1150; *Cnty. of King v. Turner*, 189 F.4th 819, 839 (9th Cir. 2026) (irreparable harm exists when governments are forced to incur costs and "disrupt and change" their services due to financial uncertainty). Moreover, the implementation of the June Directive continues to create budgetary uncertainty and administrative burdens as Plaintiff States' current SPDG grants, among other multi-year grants, are at risk of an

arbitrary and unlawful discontinuation. Heenan Decl. ¶¶ 34-35; van Haren Decl. ¶¶ 41-42; Foehr Decl. ¶¶ 28-36.

**2. Remedies at Law are Inadequate.**

Even if the Court vacates the June Directive, remedies at law are still inadequate as the Department could revive the June Directive in another form—much the same way it has claimed that the June Directive replaced the February Directive. Memorandum in Support of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment at 1, *California v. U.S. Dep't of Educ*., 2026 WL 2754968 (Department arguing that claims regarding February Directive "have been rendered moot now that the Department has issued different procedures superseding the February guidance").

Injunctive relief is necessary to protect Plaintiff States from the uncertainty that the Department's unlawful and arbitrary actions have caused. Without injunctive relief, Plaintiff States bear substantial risk that their current grants will again be subject to an arbitrary and unlawful discontinuation pursuant to the June Directive or a substantively similar policy, which would result in a reduction in services to thousands of students and the teachers and staff that support them. Heenan Decl. ¶¶ 34-35; Van Haren Decl. ¶ 40; Foehr Decl. ¶¶ 28-36. Remedies at law, such as money damages, would not be adequate to redress these profound harms.

**3. The Balance of Hardships and Public Interest Favors Plaintiff States.**

Because the Department is a United States agency, the balance of hardships and public interest analyses merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Aubin v. Bonta*, 665 F. Supp. 3d 1097, 1106 (N.D. Cal. 2023).

The balance of hardships tips sharply in favor of a permanent injunction. Absent a permanent injunction, Plaintiff States would remain subject to the Department again unlawfully canceling millions of dollars in funding. That risk would cause disruption to Plaintiff States' educational systems and harm thousands of students in Plaintiff States by depriving them of the teachers, services, and supports they need to thrive. By contrast, the Department would suffer no cognizable harm from an injunction preventing imposition of the June Directive or a similar policy under a different name: The government "cannot suffer harm from an injunction that

merely ends an unlawful practice." *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 181 (D. Mass 2025) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 327 (D. Mass. 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026) ("[T]here is no public interest in upholding unlawful agency action."). If injunctive relief is granted, the Department would retain its ability to lawfully discontinue grants and to lawfully set and impose funding priorities through the regulatory process set forth in GEPA.

**CONCLUSION**

The Court should grant Plaintiff States' Motion for Partial Summary Judgment and order the requested relief described in the Proposed Order filed concurrently herewith, including vacating and setting aside the June Directive and issuing declaratory and permanent injunctive relief.

Dated: November 2, 2026

Respectfully submitted,

**ROB BONTA**
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
CHRISTINE CHUANG
IRINA TRASOVAN
Supervising Deputy Attorneys General
JESSE BASBAUM
BEN CONWAY
ELIA HERRERA
EMILIA P. E. MORRIS
Deputy Attorneys General

/s/ *Jesse Basbaum*
Jesse Basbaum
Deputy Attorney General
1515 Clay Street, Suite 2000
Oakland, CA 94612
Telephone: (510) 879-0280
E-mail: Jesse.Basbaum@doj.ca.gov

*Attorneys for Plaintiff State of California*

**JOSHUA L. KAUL**
Attorney General of Wisconsin
AARON J. BIBB
Assistant Attorney General

/s/ *Aaron J. Bibb*
AARON J. BIBB*
Assistant Attorney General
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-0810
E-mail: aaron.bibb@wisdoj.gov

*Attorneys for Plaintiff State of Wisconsin*

**PETER F. NERONHA**
Attorney General of Rhode Island
KYLA DUFFY
Special Assistant Attorney General

/s/ *Kyla Duffy*
Kyla Duffy*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone (401) 274-4400
E-mail: Kduffy@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

*appearing *pro hac vice*

**ATTESTATION**

I, Jesse Basbaum, hereby attest under penalty of perjury that in compliance with Civil Local Rule 5-1(i)(3), I have obtained the concurrence in the filing of this document from all Signatories.

/s/ *Jesse Basbaum*
Jesse Basbaum
Deputy Attorney General